Commonwealth *vs.* Vincent A. Smigliano.

Essex. February 2, 1998. - May 20, 1998.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, Marshall, & Ireland, JJ.

*Motor Vehicle,* Operating under the influence. *Search and Seizure,* Automobile. *Constitutional Law,* Search and seizure. *Evidence,* Breathalyzer test.

Activation of a police car's blue lights behind another vehicle is a seizure requiring some level of justification inasmuch as a reasonable driver, on the activation of the blue lights, would believe that he or she was not free to leave. [491-492]

A police officer who had received a motorist's report that the defendant's automobile was "all over the road," which the officer then observed for himself, had grounds for reasonable suspicion of criminal activity, that is, that the defendant was operating while under the influence of alcohol, sufficient to justify the "seizure" of the defendant by the activation of the police officer's vehicle's blue lights behind the defendant's automobile, which had stopped. [492-494]

Where the Secretary of Public Safety has validly delegated to the Criminal Justice Training Council the authority to certify officers to administer breathalyzer tests, tests certified by such officers are valid and admissible in a criminal proceeding. [494-495]

Fried, J., concurring, with whom Lynch, J., joined, expressed the view that the police officer's stop and investigation were governed by this court's decision in *Commonwealth* v. *Leonard,* 422 Mass. 504, cert. denied, 117 S. Ct. 199 (1996).

Complaint received and sworn to in the Peabody Division of the District Court Department on February 20, 1996.

Motions to suppress evidence were heard by *Santo J. Ruma,* J., and the case was heard by *Robert E. Hayes,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael T. Smerczynski* for the defendant.

*Deirdre L. Casey,* Assistant District Attorney, for the Commonwealth.

Abrams, J. The defendant, Vincent A. Smigliano, was convicted of operating a motor vehicle while under the influ-

ence of alcohol. The defendant moved to suppress the evidence of his offense on the ground that, by activating the police car's blue lights, the officer performed an unlawful seizure. The defendant separately moved to suppress the result of a breathalyzer test on the ground that the officer administering the test was certified not by the Secretary of Public Safety (Secretary), but by the Criminal Justice Training Council (council), contrary to the terms of G. L. c. 90, § 24K. A District Court judge denied both motions. We transferred the case to this court on our own motion and now affirm the conviction.

We summarize the facts the motion judge found. On February 17, 1996, a Peabody police officer was on duty. There was a snowstorm taking place, and automobiles were sliding and skidding due to the icy road conditions. A motorist stopped the officer and told him that he had followed an automobile from Salem to Peabody and the automobile was "all over the road." After the officer saw the automobile that had been described, he followed it for approximately one-quarter of a mile, during which time he twice saw the automobile veer to the right and almost strike parked cars. The automobile stopped, and the officer pulled up behind it, activated his blue lights, and got out of his cruiser to approach the car. The officer saw the defendant (driver) slumped over with his head on the steering wheel. At first, the defendant did not respond to the officer, but he did respond a few minutes later. A conversation followed, resulting in the arrest of the defendant for operating while under the influence of liquor.

· 1. A seizure takes place within the meaning of the Fourth Amendment to the United States Constitution, see *Terry* v. *Ohio*, 392 U.S. 1 (1968), and art. 14 of the Massachusetts Declaration of Rights "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth* v. *Stoute*, 422 Mass. 782, 786 (1996), quoting *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985). We have said that, under art. 14, pursuit by a police officer constitutes a seizure that must be supported by, at least, reasonable suspicion. See *Commonwealth* v. *Stoute, supra* at 789; *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981). Here, there was no significant pursuit because the defendant had already stopped his car before the officer activated the blue lights. Nevertheless, a reasonable person, on the activation of a police car's blue lights, would believe that he or she is not free

to leave. See *Ozhuwan* v. *State*, 786 P.2d 918, 920 (Alaska App. 1990) ("in the eyes of a reasonable person, the police conduct in the present case [activating the overhead red lights] would be virtually tantamount to an overt command to 'stay put' "); *State* v. *Markgraf*, 59 Wash. App. 509, 511 (1990), citing *State* v. *DeArman*, 54 Wash. App. 621, 624 (1989). Activating the blue lights thus was a seizure requiring some level of justification.

The seizure was justified because the officer had grounds for reasonable suspicion that the defendant was engaged in criminal activity, more specifically, that the defendant was operating while under the influence of alcohol. The officer had received the motorist's report that the defendant's car had been "all over the road," and he had seen the defendant's driving. Because the facts offered to justify the seizure included the motorist's report, we evaluate the motorist's basis of knowledge and reliability. See *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). Weakness in either requirement can be made up for by independent police corroboration. *Id.* Because reasonable suspicion is a lower standard than probable cause, we apply this test less rigorously when such a report is offered to support reasonable suspicion. See *id.* Here, the motorist saw the defendant's car. Therefore, the report was based on the motorist's personal knowledge. We have no evidence as to what, if anything, the officer concluded about the motorist's reliability from their face-to-face encounter. However, the report was corroborated by the officer's observations of the defendant's car swerving and nearly hitting parked cars. Based on the report and the officer's observations, an officer could have reasonably suspected that the defendant was operating a motor vehicle while under the influence of alcohol. Therefore, activating the blue lights was justified as a *Terry* stop to investigate possible criminal activity. The judge properly denied the motion to suppress.

We do not agree with the concurrence's view that this case is controlled by the "community caretaking" rationale of *Commonwealth* v. *Leonard*, 422 Mass. 504, cert. denied, 519 U.S. 877 (1996). In *Leonard*, the challenged police action was opening the driver's side door of the defendant's car. The police officer in *Leonard* had activated his lights, "used his PA system and air horn," and knocked on the window, and the defendant was completely unresponsive. *Id.* at 505. This gave rise to a reasonable belief that the driver probably required immediate

assistance, justifying opening the door. See *id*. at 509. Indeed, it is hard to see what else the officer could have done. It would have been reasonable to believe, for example, that the defendant had had or was having a heart attack or was seriously ill, in which case the officer could not reasonably have simply left a citizen to die without exposing himself and his municipal employer to criticism and potential liability. In this case, by contrast, there are no similar facts giving rise to a reasonable belief that the defendant required immediate assistance.

There is no merit to the contention that there was no basis for a *Terry* stop simply because the officer testified he did not suspect the defendant of any wrongdoing but believed the defendant was lost[1] or having trouble. Because the facts and circumstances known to the officer are sufficient to create a reasonable suspicion of operating under the influence in a reasonable police officer, a *Terry* stop is justified regardless of the officer's subjective state of mind. See, e.g., *Ornelas* v. *United States*, 517 U.S. 690, 696 (1996) (determination of reasonable suspicion principally based on "whether [the] historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion"). See also *Whren* v. *United States*, 517 U.S. 806, 812-813 (1996) (constitutional reasonableness of traffic stops based on probable cause does not depend on actual motivations of individual officers; subjective intentions play no role in analysis under Fourth Amendment).[2]

The concurrence proposes that police officers have discretion

---

[1]An officer's reasonable belief that a motorist is lost "free of complicating elements (safety hazards, illness, suspicion of crime, or the like)" is insufficient to justify a seizure. *Commonwealth* v. *Canavan*, 40 Mass. App. Ct. 642, 647 & n.6 (1996).

[2]Many cases cited in the concurrence, identifying specific facts justifying police intervention, support our view that there must be limits on a police officer's discretion to extend a "helping hand." See, e.g., *United States* v. *King*, 990 F.2d 1552, 1561 (10th Cir. 1993) (driver incessantly honked his horn at accident site; officer reasonably believed this created a hazard); *Crauthers* v. *State*, 727 P.2d 9, 11 (Alaska App. 1986) (driver rolled down his window; officer reasonably believed he was requesting assistance); *State* v. *Puig*, 112 Ariz. 519, 520 (1975) (driver used hand signal; officer reasonably stopped him "to check apparent defects in safety devices"); *State* v. *Mitchell*, 498 N.W.2d 691, 694 (Iowa 1993) (broken taillight justified stop for safety reasons); *State* v. *Fuller*, 556 A.2d 224, 224 (Me. 1989) (headlights blinked several times; officer reasonably believed they were defective); *Provo City* v. *Warden*, 844 P.2d 360, 361, 365 (Utah Ct. App. 1992), aff'd, 875 P.2d 557 (Utah 1994) (officer

that is essentially standardless. This would leave the police with no limitations, trial judges with no guidance, and citizens with no effective constitutional protection.[3]

2. General Laws c. 90, § 24K, authorizes the Secretary to "promulgate rules and regulations regarding satisfactory methods, techniques and criteria for the conduct of [breath] tests, and [to] establish a statewide training and certification program for all operators of [breath-testing] devices." It further requires "that no person shall perform such a test unless certified by the [S]ecretary." The Secretary has promulgated regulations authorizing the council to certify breath-testing operators. 501 Code Mass. Regs. §§ 2.21-2.22 (1993). The defendant argues that this regulation is inconsistent with G. L. c. 90, § 24K, and is therefore invalid. Further, because the officer who administered a breath test to the defendant was certified by the council rather than the Secretary, the defendant argues that the test was invalid and inadmissible. We disagree.

In our view, the Secretary has validly delegated her certification authority to the council. "[A]n administrative agency . . . can delegate the performance of administrative and ministerial duties and, where it is impossible for them to be performed in person, it must do so." *Morris* v. *Commonwealth*, 412 Mass. 861, 865 (1992), quoting *Krug* v. *Lincoln Nat'l Life Ins. Co.*, 245 F.2d 848, 853 (5th Cir. 1957). It is unreasonable to expect the Secretary herself to certify each breath-test operator in person, so the duty must be delegated. The council is within the Executive Office of Public Safety, of which the Secretary is the head. G. L. c. 6A, §§ 2-3, 18. The council thus certifies operators under the Secretary's ultimate supervision. Also, the council is in the best position to determine who has successfully completed its training program, so it is the most obvious entity to perform the ministerial task of issuing the certifications. We conclude that the delegation of certification authority to the council did not violate G. L. c. 90, § 24K, that the breathalyzer

received tip that defendant was seeking to buy cocaine "so he could 'drive himself into a wall' "; stop justified for suicide prevention); *Commonwealth* v. *Waters*, 20 Va. App. 285, 291 (1995) (pedestrian staggered and walked unsteadily; officer reasonably believed he was "intoxicated, ill, or in need of help").

[3]Standards are developing to determine whether the police in "community policing" situations have acted reasonably. See *Provo City* v. *Warden*, 844 P.2d 360 (Utah Ct. App. 1992), aff'd, 875 P.2d 557 (Utah 1994). See also *State* v. *Anderson*, 142 Wis. 2d 162, 169 (Ct. App. 1987).

operator was properly certified, and that the judge properly denied the defendant's motion to suppress.

*Judgment affirmed.*

FRIED, J. (concurring, with whom Lynch, J., joins). I agree that the officer acted properly when he activated his blue lights and approached the defendant's vehicle. I also agree that these actions constituted a seizure for purposes of the Fourth Amendment to the United States Constitution and art. 14 of our Declaration of Rights. But I think it stretches a point to say, as does the court, that these actions were justified, under the rule of *Terry* v. *Ohio*, 392 U.S. 1 (1968), by a "reasonable suspicion that the defendant was engaged in criminal activity, more specifically, that the defendant was operating while under the influence of alcohol." *Ante* at 492. And there is no reason to stretch in order to justify the officer's eminently reasonable conduct. The motion judge found that "[t]here was a snowstorm taking place and the road conditions were icy and snowy; cars were sliding and skidding on the roadways." He also found that "[t]he officer lawfully stopped the motor vehicle and engaged the operator in conversation because of what the unknown motorist told him, because of what he observed while following the vehicle, and because the operator with his head slumped over the wheel should be assisted by the police." The motion judge made no finding or ruling that the officer had reason to suspect that the defendant had been operating a vehicle while under the influence of alcohol or that any other unlawful activity was afoot. He simply denied the motion to suppress. Moreover, the officer testified that, at the time he pulled up behind the defendant's vehicle, he had no thought that any violation of law had occurred, but rather that he was investigating whether the operator was lost or having some kind of trouble operating his vehicle under the hazardous condition that then obtained. The officer also testified that other vehicles were also slipping and sliding on the roads because of the very poor conditions. This testimony accords with the findings quoted above. It was on this basis that the Commonwealth briefed and argued this case to us.

In my view this case is controlled by our decision in *Commonwealth* v. *Leonard*, 422 Mass. 504, cert. denied, 519 U.S. 877

(1996). In *Leonard,* as here, the police officer noticed circumstances that led him to believe that the motorist, who was lawfully parked in a cut-out area on Storrow Drive in Boston, was in some sort of difficulty. The officer pulled in behind the stopped car and activated his blue lights. The motorist in that case did not complain about the use of the blue lights, but rather that the officer, when he was unable to obtain a response from her, opened her vehicle door. We held:

> "Even if opening an unlocked vehicle door, where the police officer is acting out of concern for the well being of the person inside rather than on the basis of a suspicion of criminality, passes some constitutional threshold requiring constitutionally sufficient justification . . . what [the trooper] did here was a minimally intrusive response to one of the myriad and uncategorizable events that may alert an officer that his assistance may be required."

*Id.* at 508-509. The officer's action in opening the vehicle door in *Leonard* would have to be categorized as a search, while what we have here is technically a seizure, but the the same principles apply.

I do not know why the court stretches to justify the seizure in this case as an exercise in criminal law enforcement when the officer's testimony, the objective circumstances, and the Commonwealth's theory of the case present a clear instance of another and entirely sufficient justification, what has long been recognized as the exercise of the "community caretaking" function. *Cady* v. *Dombrowski,* 413 U.S. 433, 441 (1973). The motion judge's findings also point in this direction and certainly speak not at all of reasonable suspicion nor of criminality. I do not understand why the court assumes that the nightstick and revolver rather than the helping hand are the more natural or the inevitable way of conceptualizing police action.

Our decision in *Leonard,* which clearly rested on the community caretaking justification, broke no new ground. To the contrary, the cases are literally legion in which police action involving a search or seizure is justified not by any reference to a law enforcement function but under this community caretaking rationale. See, e.g., *United States* v. *Rohrig,* 98 F.3d 1506, 1518-1522 (6th Cir. 1996) (entry to quell loud and disruptive noise in residential neighborhood is sufficiently compelling to

justify warrantless intrusions in certain circumstances); *Wayne* v. *United States*, 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963) ("[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person"); *People* v. *Lanthier*, 5 Cal. 3d 751, 755 (1971) (warrantless search of lockers justified to identify source of noxious odor permeating surrounding area); *State* v. *Hetzko*, 283 So. 2d 49, 52 (Fla. Dist. Ct. App. 1973) (police officers "had every reason to believe that the defendant was in distress or that some foul play had occurred"; they "would have been derelict in their duty" if they had not made a warrantless entry into the house). See generally 3 W.R. LaFave, Search and Seizure § 6.6 (3d ed. 1996).

Similarly, in the vast and much litigated domain of regulatory searches and seizures, the measure of compliance with the Fourth Amendment is certainly not whether a warrant appropriate to a criminal investigation might have been obtained or warrantless action in enforcement of the criminal law would have been justified. Rather, the question relates to the reasonableness of the action measured by the nature of the regulation being enforced and whether in the particular circumstances a warrant may reasonably be required. See, e.g., *Griffin* v. *Wisconsin*, 483 U.S. 868, 871-873 (1987) (probation officers' prerogative to conduct warrantless searches of probationers' homes for evidence of probation infraction upheld); *Commonwealth* v. *Tart*, 408 Mass. 249, 255 (1990), quoting *New York* v. *Burger*, 482 U.S. 691, 702 (1987) ("[A] warrantless administrative search to determine the permit status of a fishing vessel which is landing raw fish in the Commonwealth is 'necessary to further [the] regulatory scheme of [c. 130]' "); *McCabe* v. *Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 547 (1st Cir.), cert. denied sub nom. *McCabe* v. *Lynn*, 519 U.S. 911 (1996) (city policy permitting forcible warrantless entry of private residence to enforce order accurately to identify and promptly detain recalcitrant and dangerous mentally ill persons upheld); *United States* v. *Green*, 474 F.2d 1385, 1389 (5th Cir.), cert. denied, 414 U.S. 829 (1973) ("Until someone expert in the cause of fires arrives, inspects the scene, and determines that the fire has been completely extinguished, the firemen cannot reasonably depart. The imposition of a warrant requirement in such circumstances would immobilize the entire apparatus of

Commonwealth *v.* Smigliano.

fire protection"); *Horner* v. *State*, 836 P.2d 679, 682 (Okla. Crim. App. 1992) (warrantless inspection of salvage yard based on statutory regulation of industry was reasonable because State had substantial interest in regulating industry to control automobile theft).

To be sure, this case, like the *Leonard* case, involves not premises but a motor vehicle. But motor vehicle cases are but a species of a genus the members of which number in the hundreds. Indeed, it is standard lore that, if anything, motor vehicles are the occasion for less not more stringent constitutional safeguards than private premises. See *Cardwell* v. *Lewis*, 417 U.S. 583, 590 (1974) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects"); *Carroll* v. *United States*, 267 U.S. 132 (1925). And no basis in principle or practicality exists for departing from the fundamental touchstone of reasonableness in cases where a motor vehicle is searched or detained for other than law enforcement reasons. As the Supreme Court stated in *South Dakota* v. *Opperman*, 428 U.S. 364, 367-368 (1976), "[i]n discharging their responsibilities for ensuring public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature." And, of course, the exercise of this police function in respect to motor vehicles is neither novel nor infrequent. As the cases collected in the Appendix illustrate, courts all over the country have long recognized community caretaking as a constitutionally legitimate basis for action that constitutes a search or seizure.

Perhaps the court avoids this most natural and familiar analysis of this case out of a concern that the rubric of community caretaking is too amorphous and might be taken as offering the police carte blanche for intruding on the rights of citizens. But this is an an unwarranted concern. As its text indicates,[1] "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady* v. *Dombrowski*, 413 U.S. 433, 439 (1973). See *Maryland* v. *Wilson*, 519 U.S. 408, 411-412

[1]The relevant portion of the Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

(1997). Reasonableness is also the touchstone of art. 14.[2] But reasonableness here as elsewhere is a legal conclusion, based on an objective reasoning ultimately disciplined and policed by the courts. That the test is one of reasonableness should not be misunderstood as authorizing law enforcement officers to stop and detain whomever they wish for whatever reason they like. The test of reasonableness in respect to criminal investigations, as in the case of *Terry* stops, depends on a balance between the law enforcement function claimed to justify it and the intrusions (with its attendant dangers of abuse) on the liberty of the citizen, and this balance must in the last analysis be presented to and pass muster in court. So too here, where the justification is the performance of the multifarious purposes gathered under the rubric of "community caretaking functions," the particular intrusion must be reasonable when balanced against the justification offered for it. The cases gathered in the Appendix generally speak to the need to strike such an appropriate balance. What is clear is that here too a court must be the ultimate arbiter of reasonableness. Perhaps the best and clearest statement of what reasonableness means in this community caretaking context was articulated in *State* v. *Anderson*, 142 Wis. 2d 162, 168-170 (Ct. App. 1987):

> "The ultimate standard under the fourth amendment is the reasonableness of the search or seizure in light of the facts and circumstances of the case. . . . In a community caretaker case, this requires a balancing of the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen. . . . This test requires an objective analysis of the circumstances confronting the police officer, including the nature and reliability of his information, with a view toward determining whether the police conduct was reasonable and justified. . . . This test also requires an objective assessment of the intrusion upon the privacy of the citizen. . . . [T]his is essentially the *Terry* test, but applied in a community caretaker setting. Overriding this entire process is the fundamental consideration that any warrantless intrusion must be as limited as is reasonably

[2]The relevant portion of art. 14 of the Massachusetts Declaration of Rights states: "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions."

possible, consistent with the purpose justifying it in the first instance. . . .

"We conclude that when a community caretaker function is asserted as justification for the seizure of a person, the trial court must determine: (1) that a seizure within the meaning of the fourth amendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual.

"As to the last factor — weighing the public need and interest against the intrusion — relevant considerations include: (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." (Footnotes and citations omitted.)

Finally, the analysis offered here is not at odds with that recently announced by the Supreme Court in *Whren* v. *United States*, 517 U.S. 806, 812-813 (1996), in which the Court held that if a police officer has an objective basis for suspecting that one kind of criminality, in that case a marginal civil traffic infraction, has occurred, it is irrelevant that the actual subjective basis for the police action may have been suspicion that a far more serious form of criminality was afoot, but one for which a reasonable basis for action did not exist. This holding cannot mean, and the Court does not say, that only if a police officer has an objective basis to stop a motor vehicle for law enforcement purposes, may he take such action. This would overrule sub silentio several of the Court's own cases and a vast body of jurisprudence elsewhere. Nor does the Court say that, where there are two equally sufficient bases for police intervention, a court must first reach for the criminal rather than the caretaking justification — that it must justify the nightstick before it justifies the helping hand.

In *Whren*, the officer asserted that he made the stop in order to give the driver a warning concerning traffic violations, and

Commonwealth *v.* Smigliano.

the United States simply argued that the officer's asserted ground was a lawful one. *Id.* at 809. The *Whren* Court affirmed the defendants' convictions on being satisfied that this was a lawful ground for the stop. Likewise, in the instant case, the ground that the police officer articulated in his testimony and the one that the Commonwealth based its argument on was a constitutionally valid one.

APPENDIX.

Many Federal and State courts have held that law enforcement officials may approach and detain citizens for community caretaking purposes in a variety of circumstances without running afoul of the Fourth Amendment and equivalent State constitutional provisions. See, e.g., *Easyriders Freedom F.I.G.H.T.* v. *Hannigan*, 92 F.3d 1486, 1497 (9th Cir. 1996) (police can stop any motorcyclist wearing a helmet that looks like noncomplying variety, even though cyclist commits no offense if he lacks actual knowledge that the helmet does not comply, because stop serves dual purpose of identifying individuals who intentionally violate the law, and informing riders who are unknowingly wearing noncomplying helmets that their helmets do not comply and possibly will not protect them sufficiently); *United States* v. *King*, 990 F.2d 1552, 1560-1561 (10th Cir. 1993) (officer justified in detaining defendant's motor vehicle in order to inform defendant of hazardous conditions and to advise him to stop honking; handgun in plain view may have been lawfully possessed and so did not and was not claimed to give reasonable ground of suspicion, but detention by show of force nevertheless justified out of concern for officer's own safety and that of bystanders); *Crauthers* v. *State*, 727 P.2d 9, 10-11 (Alaska App. 1986) (where defendant stopped thirty feet before a yield sign and rolled down window of his motor vehicle, officer reasonably concluded that defendant was asking for assistance and was justified in activating overhead flashing lights and approaching defendant; citing *Cady* and declining to follow *Dunbar*); *State* v. *Puig*, 112 Ariz. 519, 520 (1975) (officer justified in stopping defendant's motor vehicle and requesting to see his license and registration after observing defendant giving a hand signal before a turn and therefore suspecting that his turn signals were inoperative); *State* v. *Harrison*, 111 Ariz. 508, 509 (1975) (officer justified in stopping defendant's motor vehicle after observing left tire of defendant's vehicle "bouncing"; "the state has a valid interest in the safety of its highways for travelers"); *State* v. *Mitchell*, 498 N.W.2d 691 (Iowa 1993) (trooper had legitimate public safety responsibility, arising from a burned-out taillight, to stop defendant even though no violation of law had occurred; there was no indication that articulated safety concern was a pretext); *State* v. *Pinkham*, 565 A.2d 318 (Me. 1989) (officer's observation of defendant motorist's misuse of marked lanes furnished sufficient reason to justify stop for purely safety purposes to advise defendant of his misuse; citing *Cady*); *State* v. *Fuller*, 556 A.2d 224 (Me. 1989) (officer was justified in stopping defendant's motor vehicle to advise him "to fix the headlights before getting stranded in the dark" where defendant's vehicle approached officer with its headlights blinking on and off, and officer "reasonably suspected that [defendant] may have