COMMONWEALTH vs. DURON McKOY.

No. 12-P-191.

Plymouth. November 9, 2012. - February 20, 2013.

Present: KANTROWITZ, BERRY, & GRAINGER, JJ.

*Firearms. Assault and Battery by Means of a Dangerous Weapon. Constitutional Law,* Search and seizure, Reasonable suspicion. *Search and Seizure,* Threshold police inquiry, Reasonable suspicion. *Threshold Police Inquiry. Practice, Criminal,* Motion to suppress.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence discovered following a stop and patfrisk, where, because of the nature of the crime, the time of day, the weather conditions, and the proximity to the crime scene, the police officers had reasonable suspicion to question the defendant and his brother; and where it was reasonable for one officer to take out and point his weapon at the outset of the encounter, given that there had been a report of a shooting, the address where the shooting had taken place had a past shooting associated with it, it was dark, and the two individuals (one of whom was very large) had their hands in their pockets. [311-315] BERRY, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on March 18, 2011.

A pretrial motion to suppress evidence was heard by *Joseph M. Walker, III,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Fernande R.V. Duffly,* J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by her to the Appeals Court.

*Stephen H. Elliott* for the defendant.

*Audrey Anderson Kachour,* Assistant District Attorney, for the Commonwealth.

KANTROWITZ, J. The defendant, Duron McKoy, was indicted for unlawful possession of a firearm, unlawful possession of ammunition, and assault and battery by means of a dangerous

weapon, in violation of G. L. c. 269, § 10(*a*), G. L. c. 269, § 10(*h*), and G. L. c. 265, § 15A(*b*), respectively. The defendant argues on appeal that the motion judge improperly denied his motion to suppress because the police unlawfully stopped him and, even if the stop were legitimate, the police used disproportionate force.

*Facts.* On January 18, 2011, at approximately 9:20 P.M., while on patrol, Brockton police Officers John Lonergan and Peter Spillane received a report of a stolen car. As they drove, they passed Edgemere Street, where they noticed two men walking. The men caught the officers' attention because they did not expect to see, and had not seen, anyone out during the adverse weather conditions: a cold, windy, wet night filled with snow and slush. As the officers passed them, the men, unsurprisingly given the poor weather, had their "hoodies" pulled over their faces and their hands inside their pockets. Upon seeing the officers, they looked away. Seconds after passing the men, the officers heard a radio call stating that a person had been shot at 41 Clarendon Avenue, which was no more than 100 yards from their current location.

Both officers testified that they were familiar with 41 Clarendon Avenue because the police were frequently called to that address due to prostitution and gang activity. Officer Spillane also testified that the previous time he was at the address, it was for a gunshot call.

The officers turned around and encountered the two men about fifty yards from where they first saw them. Both men still had their hands inside their pockets, holding them up against their waists. Because of the nature of the call, the fact that somebody had just been shot, and the probability that a firearm was somewhere close by, Officer Spillane drew his weapon and pointed at the subjects as he got out of the cruiser. Officer Lonergan also exited the vehicle and asked the men to take their hands out of their pockets. As the defendant moved his hand, "a large item" fell to the darkened ground. The other man, Antoine McKoy, the defendant's brother as it turned out, began to backpedal and only removed one hand, keeping the other in his pocket. Antoine made several motions as if he was trying to get something out of his pocket, and then ran away. At this

point, Officer Lonergan also drew his weapon as Officer Spillane chased after Antoine.

Officer Lonergan, who was left alone with the "large sized" defendant,[1] ordered him to the ground. Forty to fifty seconds later, Officer Spillane returned after he was unable to catch Antoine. The officers proceeded to stand the defendant up, and Officer Spillane conducted a patfrisk. A magazine from a firearm was discovered in the defendant's pocket. Officer Lonergan testified that after finding the magazine, they proceeded to handcuff the defendant because he might have "had a gun secreted on him some place," the other defendant had fled, and the officers wanted to be cautious in case the other defendant was "lurking behind them." Once the defendant was secured, Sergeant Mark Celia, who arrived at scene, used his flashlight to illuminate the area where the "large item" had been dropped. There he found a bottle of alcohol and a firearm. The firearm was "relatively dry" despite "everything around it [being] soaking wet," indicating that it had been recently placed there. The firearm appeared to have been recently fired because a spent casing was still in the ejector port. The handgun and the magazine were a match.

After another officer came to assist Officer Lonergan, Officer Spillane returned to the area where he had last chased Antoine. Officer Spillane proceeded to follow the only set of footprints in the area, which he knew to be Antoine's, because while jumping the fence, Antoine had lost his right sneaker. Officer Spillane testified that he found a gun in one of the footprints.

The defendant was then taken to 41 Clarendon Avenue, where the homeowner identified him as an individual that had recently been at the house. After the defendant was read the Miranda rights, he told Officer Spillane that "they were messing around with a gun and it went off."

*The stop.* In reviewing a judge's ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of the judge's ultimate findings and conclusions of law." *Commonwealth* v.

---

[1]The defendant was apparently so large that it was impossible for the officers to later get his hands behind his back in order to handcuff him. Even after using four handcuffs, the officers were unable to handcuff him.

*Washington*, 449 Mass. 476, 480 (2007). Here, the judge found that the emerging circumstances permitted the police to stop the defendant and pat frisk him.

Reasonable suspicion is determined by a twofold inquiry: "first, whether the initiation of the investigation by the police was permissible in the circumstances, and second, whether the scope of the search was justified by the circumstances." *Commonwealth* v. *Moses*, 408 Mass. 136, 140 (1990), quoting from *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). Such reasonable suspicion "must be 'based on specific, articulable facts and reasonable inferences therefrom' rather than on a 'hunch.' " *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990), quoting from *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984).[2] It is an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996), quoting from *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968).

Moreover, "where there may be an 'imminent threat' presented 'because of shots just fired, . . . there is an edge added to the calculus upon which . . . reasonable suspicion may be determined.' " *Commonwealth* v. *Ancrum*, 65 Mass. App. Ct. 647, 654 (2006), quoting from *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 557 & n.12 (2002). Specifically, the "test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation." *Commonwealth* v. *Stoute*, 422 Mass. 782, 791 (1996), quoting from *United States* v. *Bold*, 19 F.3d 99, 104 (2d Cir. 1994).

Here, the defendant and his companion were alone on the

---

[2]Our review does not hinge on the words chosen by the officer to describe his motivations, but on the facts viewed objectively by a reasonable person. We add that the dissent places great significance on Officer Spillane's use of the phrase "odds" and seeks to equate that with hunch. The plain meaning of "odds," however, is "the probability that one thing is so or will happen rather than another." Merriam-Webster Dictionary 859 (11th ed. 2003). See *Ralph* v. *Pepersack*, 335 F.2d 128, 134 (4th Cir. 1964), cert. denied, 380 U.S. 925 (1965) (cautioning against engaging in "futile and unwarranted exercise[s] in semantics"). Based on the totality of the officer's testimony, it is apparent that he acted on more than mere assumption.

street. No one else was out due to the poor weather conditions. The area from where the defendant was coming, more specifically 41 Clarendon Avenue, had a reputation of hosting crimes, and on a prior occasion, police officers, including Officer Spillane, had been called to that house because of a shooting.

At the time the police officers first saw the defendant, he was no more than 100 yards from 41 Clarendon Avenue. Within a few seconds of passing the defendant, the police officers received a radio message stating that someone had been shot at 41 Clarendon Avenue. By the time the police officers turned around and confronted the defendant, he was no more than fifty yards from where they had just seen him. Because of the nature of the crime, the time of day, the weather conditions, and the proximity to the crime scene, the police officers had reasonable suspicion to question the defendant and his brother. When asked to take their hands out of their pockets, the defendant dropped a large item to the ground, while his brother kept his hand in his pocket prior to fleeing. Taken together, these actions justified the stop. See *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981).

*Disproportionate force.* Now that we have determined the stop was permissible, we turn to the proportionality of the force employed, specifically the drawing of the gun by Officer Spillane.

"Once the [valid basis] for a stop [is] established, 'the pertinent inquiry is whether the degree of intrusion is reasonable in the circumstances.' . . . The extent of the danger is important in assessing whether the force used by the police in the encounter was commensurate with their suspicion. . . . In short, [t]he degree of [permitted] intrusiveness . . . is that which is 'proportional to the degree of suspicion that prompted the intrusion.' " *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. 192, 199 (2003). (Citations omitted.) See *Commonwealth* v. *Ruiz*, 51 Mass. App. Ct. 346, 350 (2001). When police officers have reasonable suspicion to stop someone, drawing a handgun and pat frisking a suspect may be permissible based on safety concerns. See *Commonwealth* v. *Johnson*, 413 Mass. 598, 600 (1992); *Commonwealth* v. *Owens*, 414 Mass. 595, 600 (1993). The crucial safety question is the extent of the danger at the time the police used force.

*Commonwealth* v. *Williams*, 422 Mass. 111, 117-119 (1996), is illustrative. There, police officers were on patrol when they observed the defendant running down the street. The defendant was sweating, had a strained expression on his face, and discarded his shirt without breaking pace. The officers proceeded to follow the defendant who, upon closer observation, was covered with blood. The officers ordered the defendant to stop. The defendant then took evasive action by running through back yards and scaling chain link fences. At that point, one of the officers drew his service revolver, followed the defendant, and ordered him to stop and get on the ground. While handcuffing the defendant, the officers received a radio broadcast confirming a shooting, approximately 200 to 400 yards from where they had stopped the defendant.

The court held that not only drawing a gun, but handcuffing the individual, was reasonable to ensure the officer's safety. The court reasoned that the length of the encounter, the nature of the inquiry, the possibility of flight, and the danger to the officers' safety justified the action taken. *Id.* at 119. An "officer's concern for his own safety is a fact that can be inferred from all the circumstances: it does not necessarily depend on direct testimony." *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 306 n.5 (1986). "A police officer does not have to testify specifically that he was in fear for his own safety so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger."[3] *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 n.7 (1997).

Here, it was reasonable for Officer Spillane to take out and point his weapon at the outset of the encounter. There had been a report of a shooting; the address where the shooting had taken place had a past shooting associated with it; it was dark; and the two individuals, one of whom was very large, had their hands in their pockets. Additionally, they were coming from the direction of the shooting location and were the only people out at the time. An officer is entitled to take reasonable precaution for his own safety if the facts warrant a reasonable person believing the suspect to be armed. See *Commonwealth* v. *Alvarado*, 427 Mass. 277

---

[3]Both officers testified that safety was an issue but neither stated that they were in fear.

(1998). "The Constitution does not require officers 'to gamble with their personal safety,' and police officers conducting a threshold inquiry may take reasonable precautions, including drawing their weapons, when the circumstances give rise to legitimate safety concerns." *Commonwealth* v. *Haskell*, 438 Mass. 790, 794 (2003), quoting from *Commonwealth* v. *Robbins*, 407 Mass. 147, 151-152 (1990).

*Conclusion.* There was no error in the judge's decision to deny the defendant's motion to suppress.

> *Order denying motion to suppress affirmed.*

BERRY, J. (dissenting). Based on longstanding precedent concerning what is reasonable suspicion justifying a police stop and seizure, I believe it was constitutional error to deny this motion to suppress that is before our court on interlocutory review granted to the defendant. The facts described herein demonstrate that the seizure in this case was based virtually entirely on a "hunch" — to use the police officer's words, the "odds were" that the defendant and his companion had a firearm in light of a radio bulletin of a nearby shooting. This, even though the bulletin, except for a house address, lacked any detail concerning the shooting and provided absolutely no connective link to the two men walking.

"In order for a police investigatory stop [and seizure] to be justified under art. 14 [of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution], the police must have 'reasonable suspicion' to conduct the stop. . . . To be 'reasonable' under this standard, the officer's suspicion must be grounded in 'specific, articulable facts and reasonable inferences [drawn] therefrom' *rather than on a 'hunch'* " (emphasis added). *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004).[1] (Citation omitted.)

As to why, under these governing constitutional standards,

---

[1] The Massachusetts and United States constitutional standards restated in *Scott*, which govern reasonable suspicion stops and seizures (in circumstances such as presented in this appeal), have stood for decades, dating back to *Com-*

316     83 Mass. App. Ct. 309 (2013)

Commonwealth *v.* McKoy.

the facts compel suppression in this case, let me be perfectly clear. It is indisputable that, at the point when the two police officers exited the cruiser, and one officer pointed a service revolver at the two men walking, there was a seizure.[2] See, e.g., *Commonwealth* v. *Bottari*, 395 Mass. 777, 780, 782 (1985) (seizure at the point when the police went to the defendant's car with their guns drawn); *Commonwealth* v. *Willis*, 415 Mass. 814, 820 (1993) (seizure as officers approached a defendant with guns drawn); *Commonwealth* v. *Lopes*, 455 Mass. 147, 155 (2009) (seizure occurred when the police officer drew his weapon and pointed it toward the suspect).

So, under defined constitutional standards, this court in appellate review is to consider what "specific and articulable facts" existed in this case *at the time of the stop and seizure* of the two men walking. The majority writes much about what happened *after the time of the stop and seizure* — i.e., that one man fled when confronted by the police, that the defendant had ammunition, and that a gun was found on the ground near him. But the events and firearm discovery the majority cites happened *after the seizure*. Such postseizure events are not, and cannot be, a retroactive constitutional justification. See note 6, *infra*. "[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts, and does not change character from its success." *United States* v. *Di Re*, 332 U.S. 581, 595 (1948) (footnote omitted).

---

*monwealth* v. *Silva*, 366 Mass. 402, 405-406 (1974), and *Terry* v. *Ohio*, 392 U.S. 1, 21, (1968). As the Supreme Judicial Court wrote in *Silva*, *supra*,

> "[i]n decisions both before and after the *Terry* case, we have consistently sustained the right of a police officer to make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime. Further, we have upheld the frisk incident thereto where the police officer has reason to believe that the individual is armed and dangerous. . . . [However, in] following the constitutional standards of *Terry* v. *Ohio*, *supra*, we have required that the police officer's action be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience. *A mere 'hunch' is not enough. Simple good faith on the part of the officer is not enough*" (emphasis added).

[2]The Commonwealth forthrightly conceded at oral argument that a seizure occurred with the gun display, a point the majority bypasses.

I turn to what the suppression record shows as existing at the moment of seizure by police with gun drawn and pointed. The following summary sets out the material facts relative to the seizure in a chronological fashion. The facts are taken from the uncontroverted testimony of the police officers at the suppression hearing. The suppression testimony is cited because the judge made no findings of fact.[3]

The summary sets forth what the suppression record affirmatively shows as the facts existing at the time of this seizure. The summary also negatively shows what specific and articulable facts, inferences, and information were missing at the time of the seizure.

I. *The Initial Police Sighting of the Two Men Walking.*

1. At approximately 9:30 P.M. on January 18, 2011, two police officers were driving a cruiser away from Lorraine Avenue in Brockton, having obtained a stolen car report in an unrelated matter; the cruiser proceeded to Edgemere Street.

2. It was snowing, and the officers did not see any people walking about on this stormy night.

---

[3]In lieu of findings of fact, which are required after a suppression hearing, the judge instead provided a handwritten notation on the face of the defendant's motion to suppress, which reads as follows.

"Denied after hearing: The emerging circumstance of a radio report of a party shot w/in 100 yards of the first time the police saw this defendant, coupled with the absence of any other foot or vehicular traffic in the vicinity of 41 Clarendon [Ave.] (the site of the shooting) provided reasonable suspicion that the men encountered, including this defendant, might be armed with a weapon. At the least, officer safety was a factor justifying detention and, after one party fled, to a pat frisk by the lone remaining officer (Lonergan). Walker, J. 8/30/11"

This cursory notation is merely a summary conclusion of law. It does not include a statement of subsidiary findings of fact that would be afforded deference by a reviewing appellate court. "In reviewing a ruling on a motion to suppress, [an appellate court is to] accept the judge's subsidiary findings of fact absent clear error 'but [to] conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. at 646, quoting from *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). Here, there are no such findings to defer to. Thus, I disagree with the majority's reliance on this cursory entry to support its decision. See *ante* at 311-312.

3. As the cruiser turned onto Edgemere Street, the officers saw two men (one of whom was the defendant) walking down that street; the two men had their hands in their pockets and "hoodies" up covering their heads, which were turned "a little bit maybe so you couldn't see their faces or away from the wind or something." But the officers did *not* see anything unusual in the way the men were walking.[4] Further, neither officer recognized or knew of the two men. Accordingly, the officers drove the cruiser by the two men, and the police initiated no interaction with the two walking men.

## II. *The Limited Police Radio Bulletin of a Shooting Nearby.*

1. As the cruiser moved further down Edgemere Street and turned onto Belmont Street, the officers heard a radio bulletin that there had been a shooting at 41 Clarendon Avenue, another nearby street. The only information in the bulletin was that a person had been shot at 41 Clarendon Avenue; no other details were within the bulletin. See paragraph number 4, *infra.*

2. One of the officers knew that 41 Clarendon Avenue was "a trouble spot," with a history of prostitution and of being a gang hangout; however, neither officer had any information connecting the two walking men to that house.

3. Having heard the bulletin, the officers activated the cruiser's blue lights[5] and circled back to Edgemere Street.

---

[4]Compare *Commonwealth* v. *DePeiza*, 449 Mass. 367 (2007). In *DePeiza*, the court wrote that the seizure of a man walking down a street was justified, "from the combination of the many factors found by the motion judge," as follows:

"The police encountered the defendant shortly after midnight in a high-crime neighborhood with increasing incidences of firearm violence. He was walking with his right arm held stiff and straight against his body, which, based on the officers' training at the police academy, suggested he was carrying a concealed firearm. While speaking with the officers the defendant appeared nervous, looking from left to right and shifting his feet, as if ready to run. Finally, and most significantly, throughout the encounter the defendant repeatedly hid his right side from the officers' view, and when the officers finally glimpsed that side they noticed that his right jacket pocket appeared to hold a heavy object."

*Id.* at 371-372. No such factors existed prior to the seizure in this case.

[5]As noted above, the cruiser's blue lights were activated prior to the re-

4. Given that it clearly was the radio bulletin which prompted the cruiser to return to Edgemere Street, where the two men were walking, it is of import to the constitutional analysis on reasonable suspicion to focus on what this intervening radio bulletin did, and did not, convey.

(i) As noted, the radio bulletin reported that someone had been shot at 41 Clarendon Avenue.

(ii) The bulletin provided *no* information about the shooting incident, and no detail concerning potential suspects.

(iii) The bulletin provided *no* description of what any suspect involved in the shooting was wearing.[6]

(iv) The bulletin provided no information concerning the reliability of the source of the radio bulletin of a shooting — nothing about a 911 caller, or a reliable

encounter with the two men walking. Given the clear seizure by the police display of the gun upon exiting the cruiser, it is not necessary to consider the effect of turning on the cruiser's blue lights, which occurred prior to, and separately from, the reencounter of the two men walking. Compare *Commonwealth* v. *Smigliano*, 427 Mass. 490, 491-492 (1998) (seizure occurred because "a reasonable person, on the activation of a police car's blue lights, would believe that he or she is not free to leave"), with *Commonwealth* v. *Evans*, 436 Mass. 369, 372-373 (2002) (use of blue lights not a seizure when the police are engaged in their "community caretaking function"), and *Commonwealth* v. *Briand*, 71 Mass. App. Ct. 160, 162-163 (2008), *S.C., Commonwealth* v. *Clark*, 452 Mass. 1022 (2008) (use of a cruiser's white "take down" lights for the purpose of illumination not a stop in the constitutional sense).

[6]Compare *Commonwealth* v. *Cheek*, 413 Mass. 492 (1992). In *Cheek*, a radio bulletin reporting a stabbing stated, "16 Ruthven Street [Roxbury], the second floor, stab victim stabbed to the back supposed to be conscious. For a suspect we have a black male with a black ³/₄ length goose known as Angelo of the Humboldt group . . . ." *Id.* at 493. This was deemed insufficient information to yield reasonable suspicion to stop a man wearing a dark down jacket, who was walking down the street approximately three-quarters of a mile away from the stabbing site. *Id.* at 495-496. Compare the total blank of any suspect physical or clothing description in this case.

Further, of note in *Cheek*, following the stop, the police found a handgun and ammunition in Cheek's possession. *Id.* at 493. But as I point out in this dissent, such a discovery remains subject to the taint by the original unconstitutional seizure, and compels suppression. Accordingly, I part with the majority view that the postseizure discovery of a gun and ammunition — dangerous instrumentalities — somehow relates back to cure the original seizure of the defendant in this case, which was not based on reasonable suspicion.

tipster, or a police dispatch, or police investigation of the 41 Clarendon Avenue shooting site.

III. *Gun-Drawn Seizure of the Two Men.*

1. The cruiser, with lights now activated, returned to Edgemere Street. The two men were still walking approximately fifty yards from when the officers had first seen them, and approximately 100 yards from 41 Clarendon Avenue. Nothing had changed vis-à-vis the scene of the two men; both continued to walk with their hands in their pockets and hoodies up, just like when the police cruiser had passed by earlier. In all perspectives, the visual scene was precisely the same as when the officers drove the cruiser by the first time. The only addition to the visual scene was the audio of the intervening radio bulletin, described in paragraph number 4 (i)-(iv), *supra.*

2. On this return to Edgemere Street, the officers stopped the cruiser close to the two men.

3. Officer Spillane quickly exited the cruiser and *immediately* drew his gun, pointed it at the two men, and ordered the men to show their hands.[7] (This marks the moment of seizure, see note 2, *supra*, and accompanying text about the pointed gun as the seizure).

4. At the suppression hearing, Officer Spillane explained his actions as follows:

PROSECUTOR:   "Now, when you first saw them and you exited your cruiser, did you draw your weapon or . . . ?"

SPILLANE:   "Yes. Yes, I drew my weapon."

PROSECUTOR:   "And why did you do that? What were your concerns at that point?"

---

[7]Later in the encounter, after the seizure, Officer Lonergan, who had also exited the cruiser, would draw his gun too, as the officers sought to patfrisk and arrest the two men. Given the developments after the seizure, that action was warranted, but again, a postseizure event does not retroactively justify the initial seizure by Officer Spillane drawing his gun upon exiting the cruiser.

SPILLANE:    "Well, because of the — you know, *the nature of the call, the fact that somebody had just been shot,* you know, *odds were that there's a firearm somewhere close by*" (emphasis added).

One cannot read this testimony by the officer except as being based on "*a mere 'hunch[,]' [which] is not enough*" (emphasis added). *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974). A report of a shooting, without more information, and without any connective link to two men walking on a street, even on a stormy night, is not enough. That the "odds were that there's a firearm close by" is not enough.

Central to the analysis of the stop and seizure in this case is that there was no demonstrated reliability in the information conveyed in the radio bulletin. The content of the radio broadcast had no reference to origin source, no predicate of reliability, and no independent corroboration of the information therein. Thus, it was, in legal effect, a broadcast of anonymous information. As the United States Supreme Court held in *Florida* v. *J.L.*, 529 U.S. 266 (2000), such anonymous information — which remains anonymous even if embedded in a police radio bulletin — is *not* sufficient to establish reasonable suspicion.

> "The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L."

*Id.* at 271.

The majority relies on the geographic closeness of the two walking men to a house which one of the officers, from past

experience, recognized as a trouble spot. But that geographic closeness to a house with a past history does not fill the void in reasonable suspicion as to individuals walking on a nearby street. Again, as the United States Supreme Court held in the *J.L.* case,

> "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases)."

*Id.* at 272.

Notwithstanding the actual suppression record background, as summarized in parts I, II, and III, *supra*, the majority draws a different picture concerning the stop and seizure and the police drawing of a gun and pointing it at the two men. The majority writes as follows.

> "Because of the nature of the crime, the time of day, the weather conditions, and the proximity to the crime scene, the police officers had reasonable suspicion to question the defendant and his brother.
>
> ". . .
>
> "Here, it was reasonable for Officer Spillane to take out and point his weapon at the outset of the encounter. There had been a report of a shooting; the address where the shooting had taken place had a past shooting associated with it; it was dark; and the two individuals, one of whom was very large, had their hands in their pockets. Additionally, they were coming from the direction of the shooting location and were the only people out at the time. An

officer is entitled to take reasonable precaution for his own safety if the facts warrant a reasonable person believing the suspect to be armed."

*Ante* at 313, 314. This description, I respectfully believe, is not in accord with the record. First, the broad brush description in the majority opinion fails to deal with, and to tie, the actual point of the seizure to reasonable suspicion standards in the case law.[8]

Second, while an officer may, of course, take precautionary action by drawing his or her service firearm in protection against an armed and dangerous suspect, there must be, in the first place, a reasonable basis and reasonable suspicion that the suspect is armed and dangerous. The drawing of a gun pointed at a suspect, as a patfrisk, requires that the police officer "reasonably fear[] for his own safety or the safety of the public, . . . or [that] the police officer reasonably believe[] that the individual is armed and dangerous." *Commonwealth* v. *Isaiah I.*, 450 Mass. 818, 824 (2008). (Citations omitted.) The fear or belief that an individual is armed and dangerous must be "based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience." *Commonwealth* v. *Wilson*, 441 Mass. 390, 394 (2004).

Contrary to what the majority writes, Officer Spillane did not

---

[8]The majority quotes one factor from *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 557 (2002). *Among a number of factors, one factor*, noted in *Doocey*, is that where there may be an "imminent threat" presented because "of shots just fired, . . . there is an edge added to the calculus upon which . . . reasonable suspicion may be determined." But the majority ignores most of the other significant factors present in *Doocey* — and not present in this case — which markedly distinguish the stop and seizure in that case. These other factors present in *Doocey* include, but are not limited to, "independent police corroboration of the report of the criminal activity." *Id.* at 556. As the *Doocey* court noted, there was "a 911 call, in which the witness [deemed to be reliable] provided his telephone number and address. A police detail was immediately directed to interview him." *Id.* at 551 n.3. This identified 911 caller provided a description to the police: "the witness had seen two male suspects dressed in black clothing leaving the park and heading down Second Street in the direction of L Street." *Id.* at 551. Further, there was a second identified witness who had seen the two men continuing down Second Street. Neither independent corroboration, nor a reliable 911 caller, nor a second witness, nor any clothing description tied to the shooting site at 41 Clarendon Avenue is present in the instant case — all of which is ignored by the majority in its reliance on *Doocey.*

say that he drew his service revolver because specific, objective facts unfolding before him gave rise to the need for "reasonable precaution for his own safety." Rather, as noted, the officer only testified that he drew his revolver because of the "odds" (which is a hunch) associated with the radio bulletin of a shooting nearby so that he thought the "odds" were (the hunch was) that the two men might have a gun. But, at this point, based on the actual facts present, and for the legal reasons discussed in this dissent, the suppression record did not present specific and articulable facts that the two men walking were armed and dangerous.

That firearms are a real and present threat to police officers on patrol is a given to me, and that police officers may, and must, take steps to lessen danger is also a given. However, in this case, the initial police action of a gun-drawn seizure — without sufficient reasonable suspicion, and without the police undertaking other, more proportionate cautionary and protective threshold investigative steps — is constitutionally infirm. I turn again to what is constitutional law under the Fourth Amendment to the United States Constitution.

> "Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry*'s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U.S., at 30. But an automatic firearm exception to our established reliability analysis would rove too far."

*J.L.*, 529 U.S. at 272.

*Conclusion.* Based on the foregoing, I am of the opinion that the limited factual tableau — and the limited radio bulletin — did not yield reasonable suspicion to justify this seizure at the time it was made. Instead, at the time the seizure occurred, the marginal record facts were far below specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience. (See cases collected in note 1 and accompanying text). For these reasons, I believe the motion to suppress should have been granted, and I dissent.