Following a jury trial in the Boston Municipal Court, the defendant, Shaquan L. Pinckney, was convicted of several firearm-related offenses. On appeal, he only challenges the denial of his motion to suppress the firearm. We affirm.
Background. We summarize the judge's findings of fact entered orally after the hearing on the motion to suppress.[2] We have supplemented the findings with evidence that is "uncontroverted and undisputed" because the judge credited the testifying police officer, who was the sole witness at the suppression hearing. Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007).
At approximately 3:42 A.M. on June 6, 2015, Boston police Officer Jeffrey Connolly was working as a uniformed patrolman in a marked police vehicle in the Humboldt Avenue area of Dorchester, an area commonly referred to as the H Block, a high-crime area frequented by the H Block gang. A particular house in the H Block area had prompted five to six 911 calls for complaints of gang activity and loud noise.
After his shift ended, Connolly was driving on Humboldt Avenue when a motorized scooter pulled out in front of him. He observed two males on the scooter, neither of whom was wearing a helmet. The area was well-lit, and he recognized the driver, Claudio Lopes, with whom he had had several encounters and whom he knew was part of the Woodward Avenue gang and had a previous firearm charge.
Connolly knew that legally the men should have been wearing helmets while riding the scooter. However, he did not activate his cruiser's lights for a traffic stop because he did not want the scooter to crash. Instead, the cruiser and scooter drove down Humboldt Avenue for about one-half mile before stopping at a red light at the intersection of Martin Luther King Boulevard and Humboldt Avenue. The scooter pulled to the right side of Humboldt Avenue in order to turn right onto Martin Luther King Boulevard. Connolly had his window down, and his cruiser was stopped about five feet away to the left of the scooter. Connolly and Lopes began conversing. Connolly asked Lopes why he was driving without a helmet and why he was driving at 4:00 A.M. Lopes appeared "jubilant," and said that he was coming back from celebrating at his birthday party. He told Connolly that he was "fucked up." Connolly believed that Lopes may have been under the influence at that time. The exchange between the two was brief, with four to five questions and answers back and forth.
At the time of his conversation with Lopes, Connolly did not know the identity of the scooter's passenger, who was the defendant. He noticed that the defendant was not engaging in conversation while he questioned Lopes, and he observed that the defendant was leaning forward with his hands pressed tightly against his own lower-abdomen area. He further observed that the defendant was wearing a sweatshirt with the Miami Heat logo, which he knew was the trademark of a rival gang of the H Block.
Connolly was trained in the characteristics of an armed gunman to recognize the defendant's body position as a threat to his safety. This, taken together with the sweatshirt and Connolly's unfamiliarity with the defendant and familiarity with Lopes and his criminal history, made Connolly increasingly concerned. Given these concerns, he proceeded to ask the defendant where he was from; the defendant gave his address. Connolly knew that specific address to be involved in firearms incidents and shootings in 2013 to 2014.
Connolly testified that the defendant was "stoic" while being questioned, staring wide-eyed at him with a "frozen body." Connolly asked the defendant to move his hands away from his waist, stating something to the effect of "I know Mr. Lopes, but I don't know you. I'd feel more comfortable if you put your hands away from your waist." The defendant complied, raising his hands and placing them on Lopes's shoulders.
When the defendant raised his arms, Connolly saw what he thought was the black butt end of a firearm in the defendant's waistband. Connolly was familiar with the license-to-carry laws at the time of the incident, and he was thus aware that a person must be at least twenty-one years old to obtain a license to carry a firearm. He also knew that Lopes was only about nineteen years old, and believed that the defendant appeared to be around the same age.
Not wanting to reveal that he had seen the firearm, Connolly asked Lopes to pull the scooter over to discuss the lack of helmets. At that point, Lopes's "eyes opened," and he turned right and drove down Martin Luther King Boulevard. Connolly drove after the scooter and activated his cruiser lights in an attempt to pull the scooter over. Lopes continued driving down Martin Luther King Boulevard at around twenty miles per hour.
Connolly notified the police department that a known person on a scooter failed to stop and there was a firearm involved. The scooter eventually crashed, and both Lopes and the defendant were apprehended. As no firearm was recovered from them, police returned to the area where Connolly had not had a direct view of the defendant and Lopes. There the police recovered a firearm.
Discussion. In reviewing the denial of a motion to suppress, we accept the " 'judge's subsidiary findings of fact absent clear error'; however, we review independently his ultimate findings and conclusions of law." See Commonwealth v. Ramirez, 92 Mass. App. Ct. 742, 743 (2018), quoting from Commonwealth v. Scott, 440 Mass. 642, 646 (2004). We "leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing." Commonwealth v. Contos, 435 Mass. 19, 32 (2001), quoting from Commonwealth v. Eckert, 431 Mass. 591, 592-593 (2000).
The defendant argues that his motion to suppress should have been allowed because the officer's act of turning his attention to the defendant, asking for his address, and "commanding" him to lift his hands constituted a seizure, and at the time of that seizure the officer lacked reasonable suspicion that the defendant was unlawfully carrying a firearm. We disagree.
We employ an objective standard to determine the moment a person has been seized: "A person has been seized by a police officer 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " Commonwealth v. Lopez, 451 Mass. 608, 611 (2008), quoting from Commonwealth v. Borges, 395 Mass. 788, 791 (1985). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Commonwealth v. Franklin, 456 Mass. 818, 820-821 (2010), quoting from Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).
Contrary to the defendant's contention, Connolly's questions and "command" that the defendant lift his hands did not amount to a show of authority converting the encounter into an unconstitutional seizure. There was no seizure when the officer asked the defendant for his name and address. See Commonwealth v. Lopez, supra ("[N]ot every encounter between a law enforcement official and a member of the public constitutes [a seizure]"). Mere questions posed by an officer to an individual do not constitute a seizure. See Commonwealth v. Stoute, 422 Mass. 782, 789 (1996) ; Commonwealth v. Barros, 435 Mass. 171, 173-174 (2001) ; Commonwealth v. Ramirez, 92 Mass. App. Ct. at 744.
Furthermore, Connolly's request that the defendant move his hands, without more, was not sufficiently coercive or intimidating to convert this encounter into a seizure subject to the constitutional requirement of a showing of objective justification. See Commonwealth v. Martin, 467 Mass. 291, 303 (2014). Officer Connolly merely told the defendant "I'd feel more comfortable if you had your hands away from your waist." This language reflects a request, not a command. See Commonwealth v. Nestor N., 67 Mass. App. Ct. 225, 228-229 (2006).
We agree with the motion judge that the defendant was seized only when the officer turned on his cruiser lights and asked Lopes to pull over to discuss the traffic violation (operating a motorized scooter without a helmet). See Commonwealth v. Smigliano, 427 Mass. 490, 492 (1998) ; Commonwealth v. Quintos Q., 457 Mass. 107, 110 (2010). Indeed, this was the first time that the officer's conduct amounted to a show of authority sufficient to constitute a seizure for constitutional purposes.
We now turn to whether Connolly's seizure of the defendant was warranted. "Where a police officer has a reasonable, articulable suspicion that a person has committed, is committing, or is about to commit a crime, the officer may stop that person to conduct a threshold inquiry." Commonwealth v. Bostock, 450 Mass. 616, 619 (2008). This suspicion must be based on articulable facts and experience; that is more than a "mere hunch." Ibid.
By the time that Connolly turned on his cruiser lights and asked Lopes to pull over, he had seen the black butt end of a firearm in the defendant's waistband. Moreover, the defendant's sudden flight, body positioning, carrying of the firearm in his waistband rather than in a holster, and youthful appearance (rendering any possibility of legal gun ownership highly unlikely) were sufficient to justify a reasonable suspicion that he was illegally carrying a firearm. See Commonwealth v. DePeiza, 449 Mass. 367, 371-374 (2007).
Judgments affirmed.

There is no contention that the findings are erroneous.