NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-820                                           Appeals Court

COMMONWEALTH  vs.  JIMMY WARREN.

No. 13-P-820.

Suffolk.     October 2, 2014. - June 10, 2015.

Present:  Rapoza, C.J., Cypher, Green, Rubin, & Agnes, JJ.[1]


Firearms.  Practice, Criminal, Motion to suppress.
    Constitutional Law, Search and seizure, Investigatory stop,
    Reasonable suspicion.  Search and Seizure, Threshold police
    inquiry, Reasonable suspicion.  Threshold Police Inquiry.



    Complaint received and sworn to in the Roxbury Division of
the Boston Municipal Court Department on December 19, 2011.

    After transfer to the Central Division, a pretrial motion
to suppress evidence was heard by Tracy-Lee Lyons, J., and the
case was heard by Annette Forde, J.


    Nelson P. Lovins for the defendant.
    Michael Glennon, Assistant District Attorney, for the
Commonwealth.


    _____

    [1] This case was initially heard by a panel comprised of
Justices Green, Rubin, and Agnes.  After circulation of the
opinion to the other justices of the Appeals Court, the panel
was expanded to include Chief Justice Rapoza and Justice Cypher.
See Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181
n.2 (1993).

GREEN, J.   On appeal from his conviction of carrying a firearm, the defendant claims error in the denial of his motion to suppress a firearm.   The firearm was recovered near the sidewalk on which the defendant ran from police who sought to question him concerning a breaking and entering that had occurred at a nearby residence earlier that evening.   At issue is whether there was reasonable suspicion to justify the directive to stop issued by one of the officers during his pursuit of the defendant.   We conclude that reasonable suspicion justified the stop, and therefore affirm.

Background.   We summarize the facts from the motion judge's careful findings, supplemented by evidence in the record that is uncontroverted and that was implicitly credited by the motion judge.[2]   See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).

On Sunday, December 18, 2011, Boston police Officer Luis Anjos was on duty and in uniform, traveling alone in a marked police cruiser, in area B-2 in the Roxbury section of Boston.   At 9:20 P.M. he received a radio call "that there was a breaking and entry in progress and the suspects were fleeing the area."

---

[2] We note that our two dissenting colleagues incorporate within their respective dissents reference to materials outside the record including, in some instances, hearsay material that would not have been admissible if offered in evidence at the motion hearing.

The dispatcher gave "several paths of flight" from Hutchings Street -- where the breaking and entering had occurred -- one toward Seaver Street and one toward Jackson Square.[3]

Anjos went to the scene of the breaking and entering and spoke with the victims, a teenage male and his foster mother. The male victim told Anjos that he had left his room to go to the bathroom and that, when he was returning, his foster mother told him that she heard people in his bedroom. The male victim opened his bedroom door and saw a "black male jumping out of the window." The man was wearing "a red hoodie" (hooded sweatshirt) and, when the male victim ran to the window to look outside, he saw "three black males, one was wearing a red hoodie and the other two [were] wearing all dark clothing." One of the two in dark clothing was wearing a "black hoodie" and the male victim could not be more specific about the third man except to say that he was "definitely wearing dark clothing." The men ran down Hutchings Street -- which could have led them either to Seaver Street or to Walnut Avenue. The male victim told the officer that his Apple MacBook and five baseball hats were missing. Both victims gave the officer their names, as well as their dates of birth.

Anjos spoke to the male victim and his foster mother for approximately eight to twelve minutes and broadcast the

---

[3] The two directions are inconsistent with one another.

description he had been given.  He then began to drive around the area to see if he could find anyone who fit that description.  It was a cold night (twenty-three degrees Fahrenheit), and the officer did not see anyone walking on the adjoining or connecting streets.  After about fifteen to eighteen minutes, as Anjos began to head back to the police station, and while passing some basketball courts in the area of Martin Luther King Boulevard, he saw "two black males walking up facing [him] and they were wearing all dark clothing."  At least one was wearing a hoodie.[4]

Anjos rolled down the passenger's side window of his cruiser and yelled out, "Hey guys, wait a minute."  He still was sitting in the cruiser and had activated neither his lights nor his siren at any point.  The two men "made eye contact" with Anjos, looking in his direction, and then turned around and "quickly started jogging" in the direction of Dale Street, down a path through a park.  Anjos had worked in area B-2 for ten years and was familiar with the park; he had responded to calls for assaults and batteries, and firearm arrests, among others.  He described the park as "a pretty busy area in the summertime."  He also testified, "There are a lot of gang members from the local area that hang out there. . . .  Once you get inside [the

---

[4] The officer opined that it would have taken "probably ten to twelve minutes" to walk the distance between the scene of the break and the location where he saw the two men.

park], you've got a cover so nobody can see you unless you walk in on them."

After the two men jogged into the park, Anjos radioed to dispatch that men fitting the description were traveling through the park towards Dale Street.[5]  Anjos saw them later, after they were stopped, and he identified the defendant in court as one of the two.

Boston police Officer Christopher Carr responded with another officer, David Santosuosso, to Anjos's request for help. Carr had been a Boston police officer for seven years and had received special training from the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives "on characteristics of an armed gunman," and he had made several firearm arrests himself. Carr heard Anjos broadcast a description of "several males that matched a description from a previous [breaking and entering]"; Carr and Santosuosso were nearby and arrived in a matter of seconds.  When they did, they saw "two males matching the description that Officer Anjos had broadcast walking through the park."  Both men were wearing dark clothing.  Carr also was familiar with the park and testified that "recently there's been, I want to say, at least two people shot by the park.  Many rounds recovered.  Shots fire[d] calls."

---

[5] Anjos admitted on cross-examination that he said on the radio that he had seen three, rather than two, black males run through the park.

Carr pulled the cruiser to the side of the street and both he and Santosuosso got out of the car. No lights or sirens were activated. Carr was closest to the two men and he started to speak to them; his firearm was not drawn. He "started to say, 'Hey fellas, can I . . .' and . . . only got about two words out, and the suspect made a right hand turn, one eighty, and took off back into the park." The other man remained standing still.

Officer Carr ran after the young man, who appeared to him to be sixteen or seventeen years old ("[d]efinitely under the age of twenty-one"), losing sight of him "for a couple of seconds" at one point. Carr eventually saw the man run into the backyard of a residence on Wakullah Street. At one point during his pursuit, Carr saw that the man was "clutching the right side of his pants as he was running up the hill back into the park."[6] Carr shouted at the man to stop, but the man continued running. Eventually, Carr apprehended the man, later identified in court as the defendant, Jimmy Warren, and ordered him to get down on

---

[6] Based on his training and experience, Carr knew that behavior was consistent with carrying a gun without a holster and, also, that it was not uncommon for people carrying guns illegally not to store them in a holster.

the ground.[7]  There was a brief struggle and the defendant was placed under arrest.

A "Walther .22 caliber firearm" was recovered "less than five yards off the sidewalk on the inside of the fence of [the residential yard where the defendant was arrested]."  The defendant and his companion were the first individuals whom any of the officers encountered after hearing the radio call about a breaking and entering.

Discussion.  "In reviewing a decision on a motion to suppress, 'we accept the judge's subsidiary findings of fact absent clear error "but conduct an independent review of [her] ultimate findings and conclusions of law."'"  Commonwealth v. Delacruz, 463 Mass. 504, 512 (2012), quoting from Commonwealth v. Scott, 440 Mass. 642, 646 (2004).  As the motion judge noted, all of the police officers involved had reliable information that a serious crime had taken place.  Two victims gave their names and dates of birth and were interviewed at their residence

---

[7] In her findings, the motion judge noted that Carr's observation of the defendant "clutching his right side of his pants and holding it up while he ran . . . was after a verbal command to stop."  The Commonwealth argues that this finding "was unsupported by the officer's testimony at the hearing, and thus clearly erroneous."  We disagree.  On direct examination, the officer did testify, more than once, that he first "began issuing the defendant verbal commands to stop" at the end of the chase, when the defendant was "almost in the middle of the backyard."  However, on redirect examination, the prosecutor asked Carr, "And did you see him making that touching motion before you told him to stop?"  The officer answered, "No."  The judge's finding, therefore, was supported by the evidence.

regarding a home invasion that just had taken place.  See Commonwealth v. Anderson, 461 Mass. 616, 622, cert. denied, 133 S. Ct. 433 (2012), and cases cited.  ("'An eyewitness's report to police of [a] recent, firsthand observation satisfies the basis of knowledge prong.'  Commonwealth v. Depina, 456 Mass. 238, 243 [2010].  See Commonwealth v. Costa, 448 Mass. 510, 515 [2007]."  In addition, such a report also satisfies the reliability prong.  See Commonwealth v. Costa, supra at 516; Commonwealth v. Love, 56 Mass. App. Ct. 229, 232 [2002]).

Equipped with information about the crime, and seeing two young men who matched the description he had been given minutes earlier, in a location that roughly corresponded to the distance the perpetrators might have traveled by foot in the interim, Officer Anjos properly sought to speak with the two young men. At that time, he was sitting in a police cruiser, with no lights or siren activated and no weapon displayed, and his statement, "Hey guys, wait a minute," was not a stop.  As observed in Commonwealth v. Martin, 467 Mass. 291, 303 (2014), "Although the record does not establish the precise words [the detective] used in addressing the defendant, the motion judge found that [the detective] had 'called out to [the defendant] to hold up or stop we want to speak with you or words to that effect.'  These words more closely resemble a 'request to speak with the defendant and ask questions,' Commonwealth v. Nestor N., 67 Mass. App. Ct.

225, 228-229 (2006), which does not rise to the level of a seizure, than a 'command to stop,' id., which is an 'intrusion of constitutional dimensions that requires justification.' Commonwealth v. Gomes, 453 Mass. 506, 510 (2009). See, e.g., Commonwealth v. Lopez, 451 Mass. 608, 610 (2008) (statement 'can I speak with you' not seizure); Commonwealth v. Barros, 435 Mass. 171, 172, 173-174 (2001) (statement 'Hey you . . . I want to speak with you' was not seizure); Commonwealth v. Stoute, [422 Mass. 782, 789 (1996)] (police request that suspect 'hold up a minute' not seizure)."[8] The fact that the two men in the present case made eye contact and then turned and jogged away from Officer Anjos, and that the defendant later turned and ran away from Officer Carr, provides further support for the motion judge's conclusion that there was no stop and no seizure at that time. See Commonwealth v. Martin, supra ("Particularly given that the defendant continued to walk away quickly after [the detective] called out to him, the motion judge did not err in concluding that a reasonable person in the defendant's situation would have felt free to leave"). See also Commonwealth v. Rock, 429 Mass. 609, 611-612 (1999) (officer's request to "talk to you for a second" left suspect believing he was free to leave);

---

[8] For the same reason, Officer Carr's statement, "Hey fellas . . ." was not a stop or a seizure: even though Carr and Santosuosso got out of the police cruiser at that point, no lights, sirens, or weapons were displayed.

Commonwealth v. Sykes, 449 Mass. 308, 313 (2007) (defendant felt free to leave where he did not respond to officer; no stop).

We consider it significant in the present case that, at the time Officer Carr directed the defendant to stop, he and other officers were engaged in the investigation of a report of recent criminal activity in the vicinity. In such circumstances, we find instructive the inventory of factors identified in Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 554-556 (2002): (1) the particularity of the description of the suspects; (2) the number of persons in the area at the relevant time; (3) the proximity of the stop to the location of the reported crime; (4) the time elapsed between the reported crime and the investigatory stop; (5) the actions of the suspect upon the initial encounter with police (including any evasive action); (6) police corroboration of the reported criminal activity; (7) the geographic area where perpetrators might be expected to have gone after the crime; and (8) whether the area is or is not a "high crime area."[9]

In weighing reasonable suspicion, the motion judge properly considered the fact that the defendant twice ran from police officers who approached him. See Commonwealth v. Depina, 456 Mass. at 246. See also Commonwealth v. Mercado, 422 Mass. 367,

---

[9] As Doocey observes, the last of these factors often carries comparatively little weight. See 56 Mass. App. Ct. at 556 n.11.

368, 371 (1996) (defendant's actions in ceasing to exit store and backing up into vestibule, upon seeing police officer, added to reasonable suspicion calculation); Commonwealth v. Stoute, 422 Mass. at 791 ("The defendant's failure to stop at [the officer's] request, and his accelerated pace as he drew away from the officers, could have contributed to [the officer's] suspicion").

In addition, as we have observed, with Officer Anjos having interviewed the victims of the crime at the scene, the officers had verified the reliability of the report.  The description of the men involved in the home invasion had included two men of color, dressed in dark clothing, with one man wearing a hooded sweatshirt.  We acknowledge that the description was somewhat general and lacking in detail.  Nonetheless, two men who fit that description were seen on the street some nine or ten blocks away, within only about thirty minutes of the report of the crime.  It was twenty-three degrees outside and none of the officers had seen anyone else walking on the street since the report.  The relatively close proximity of the defendant to the time and place of the reported crime, together with the fact that the officers saw no one else on the streets on that cold evening, furnishes further justification for a threshold inquiry.  Moreover, once the defendant started to run for a second time, to again avoid interaction with the investigating

officers, Officer Carr had reasonable suspicion that the defendant was involved in the reported home invasion, meriting further inquiry to confirm or dispel that suspicion.[10]

"Neither evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support the reasonable suspicion necessary to justify a stop and frisk. . . . Each of these factors may, however, be considered by the police, and in combination may allow the police to narrow the range of suspects to particular individuals." Commonwealth v. Mercado, 422 Mass. at 371. In this case, the facts, examined in combination, compare favorably to those in stops that have been upheld by the courts. See, e.g., Commonwealth v. Depina, 456 Mass. at 245-247. To make an investigatory stop based on a physical description, the description cannot be so general that it would include a large number of people in the area where the stop occurs, nor need it be so particularized as to fit only a single person, provided other accompanying circumstances are present. See id. at 246-247. Here, as in Depina, the description of the perpetrators, together with the spatial and temporal proximity of the defendant and his companion to the scene of the home invasion, the defendant's twice reversing

---

[10] For the reasons already explained, the officer's request to the defendant, who already had begun running for a second time, whether in the words, "Hey fellas," or a more explicit request to "stop," did not, without more, rise to the level of a seizure for constitutional purposes.

direction and running away upon encountering the police, and the gravity of the crime under investigation gave rise to a reasonable suspicion that justified Officer Carr's stop of the defendant. See id. at 247 (gravity of the crime and present danger of circumstances may be considered in reasonable suspicion calculus). See also Commonwealth v. McKoy, 83 Mass. App. Ct. 309, 312-313 (2013), where the facts supporting reasonable suspicion were considerably weaker than those in the present case, but still supported reasonable suspicion (anonymous report of shots fired, no description at all given about potential suspects; two men in hooded sweatshirts, the only people on the street at that time, were walking in cold and snowy weather not far from the scene of the crime).

In sum, in the present case we see most of the Doocey factors. While the description itself was not precise, the fact that there were two individuals who fit it, rather than one, enhances its value. Contrast Commonwealth v. Cheek, 413 Mass. 492, 496 (1992). In addition, the defendant and his companion were close in time and proximity to the location of the report of a serious crime, and the "population of individuals in the area at the relevant time" included only the defendant and his companion. Commonwealth v. Doocey, 56 Mass. App. Ct. at 554. Furthermore, there was "independent police corroboration of the report of the criminal activity"; and the "characteristics of

the place of the suspected criminal activity (including whether it is a high crime area)" also support the inference the officer drew.  <u>Id</u>. at 556.

The motion to suppress was properly denied.[11]

<u>Judgment affirmed</u>.

---

[11] Though our view of the case obviates any need to consider the Commonwealth's argument that the motion should have been denied without a hearing on the ground that the defendant abandoned the firearm, we note that the facts do not support that argument.

AGNES, J. (dissenting, with whom Rubin, J., joins).  No one disputes that a police officer has the authority to stop and briefly to detain a person on the street in order to conduct a threshold inquiry whenever specific facts establish reasonable suspicion that the individual has committed, is committing, or is about to commit a crime.[1]  But it is equally settled that a police officer's belief that a person on the street is involved in criminal activity does not make the officer's suspicion reasonable.  "A mere 'hunch' is not enough.  Simple good faith on the part of the officer is not enough.  The test is an objective one."  Commonwealth v. Bacon, 381 Mass. 642, 643 (1980), quoting from Commonwealth v. Silva, 366 Mass. 402, 406 (1974).

Two ingredients must be present to establish reasonable suspicion:  (1) police knowledge of objective facts and circumstances relating to a past, present, or future crime, as opposed to guesswork, a hunch, or intuition, and (2) a specific

---

[1] See Commonwealth v. Silva, 366 Mass. 402, 405 (1974) ("[W]e have consistently sustained the right of a police officer to make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime").  See also Terry v. Ohio, 392 U.S. 1, 27 (1968); United States v. Camacho, 661 F.3d 718, 726-727 (1st Cir. 2011); Commonwealth v. Lehan, 347 Mass. 197, 204 (1964); Commonwealth v. Matthews, 355 Mass. 378, 380-381 (1969); Commonwealth v. Riggins, 366 Mass. 81, 87 (1974); Commonwealth v. Almeida, 373 Mass. 266, 270-271 (1977); Commonwealth v. Ferrara, 376 Mass. 502, 504 (1978); Commonwealth v. Wren, 391 Mass. 705, 707 (1984); Commonwealth v. Mercado, 422 Mass. 367, 369 (1996).

connection, i.e., individualized suspicion, between those objective facts and circumstances and the person stopped. See, e.g., Commonwealth v. Matthews, 355 Mass. 378, 380-382 (1969).[2]

In the present case, the description of the perpetrators taken by Boston police Officer Luis Anjos and passed on to other officers was too general to establish individualized suspicion connecting the defendant, Jimmy Warren, to the breaking and entering on Hutchings Street in the Roxbury section of Boston at the time of the stop. Neither of the two males Officer Anjos encountered matched the most descriptive parts of the victim's observations of the perpetrators -- that one was wearing a red sweatshirt and one was carrying a backpack (containing stolen goods). Additionally, the observation of two black males wearing dark clothing about one mile from the scene of a breaking and entering involving three black males in a densely

_____

[2] United States Supreme Court Chief Justice Earl Warren, writing for the Court in Terry v. Ohio, said, "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." 392 U.S. at 21 n.18. See United States v. Martinez-Fuerte, 428 U.S. 543, 560 (1976) ("to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure"); United States v. Cortez, 449 U.S. 411, 417-418 (1981) (test is whether there is a "particularized and objective basis for suspecting the particular person stopped of criminal activity"); Ornelas v. United States, 517 U.S. 690, 696 (1996) ("We have described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity"), quoting from United States v. Cortez, supra. See generally United States v. Massenburg, 654 F.3d 480, 486 (4th Cir. 2011).

populated residential neighborhood of Roxbury, lacks the element of proximity to the scene of the crime that so often is a significant factor in cases involving legitimate threshold inquiries.[3]  Finally, flight or evasive behavior, without more, is insufficient to establish reasonable suspicion for a threshold inquiry.  Commonwealth v. Mercado, 422 Mass. 367, 371 (1996) ("Neither evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support the reasonable suspicion necessary to justify a stop and

---

[3] See, e.g., Commonwealth v. White, 44 Mass. App. Ct. 168, 172 (1998) (police had reasonable, articulable suspicion when, inter alia, codefendants were "just blocks away" from where shooting occurred and were "located in the general area toward which the perpetrators were said to be heading . . . and were the only people . . . in a largely deserted commercial zone at a time after 3:30 A.M."); Commonwealth v. Gunther G., 45 Mass. App. Ct. 116, 118 (1998) (suspects "close by the area where the shooting was reported, and with no one else on the street at that late hour," inter alia, "reasonably supports a conclusion that they were persons possibly involved in the reported incidents"); Commonwealth v. Foster, 48 Mass. App. Ct. 671, 676-677 (2000) (reasonable suspicion when, inter alia, police see suspects matching physical description, on same street and headed in same direction as informant indicated).  See also United States v. Arthur, 764 F.3d 92, 97 (1st Cir. 2014) ("At the time of the initial seizure, Officer Golden had received a reliable, though generic, description of the number of suspects and their race, gender, clothing, and approximate location, as well as information about the direction in which they were heading.  The location and direction information was corroborated by an unconnected witness [the leaf-raker].  Just minutes had elapsed since the robbery when the suspects, who mostly matched the description, were encountered just an eighth of a mile from the crime scene, heading in the expected direction").

frisk").[4]  The reason why such behavior does not satisfy the test

for reasonable suspicion is that it is not sufficiently

_____

[4] This principle is illustrated in Commonwealth v. Thibeau,
384 Mass. 762 (1981).  There, the defendant was riding a bicycle
in the Jamaica Plain section of Boston around 10 P.M.  Id. at
763.  Two police vehicles, one of them marked, pulled up
alongside him.  Ibid.  The defendant looked at the marked
cruiser, turned sharply to his left, and pedaled away.  Ibid.
With his siren blaring, the officer in the unmarked cruiser
pursued the defendant, ultimately reaching out, grabbing him,
and forcing him to the sidewalk.  Ibid.  During the ensuing
search of the defendant's person, the officer discovered
narcotics.  Ibid.  The Supreme Judicial Court noted that there
was evidence that the investigating officer, who was an
experienced narcotics investigator, "recognized an increasing
use of bicycles to transport illegal drugs."  Ibid.
Nevertheless, the court concluded that the officer's knowledge
that bicycles were used to transport narcotics and the
defendant's sudden left turn down St. John Street at the
approach of the police were insufficient "as a matter of law" to
provide reasonable suspicion and thus justification for the
police pursuit that was deemed a stop.  Id. at 763-764 (emphasis
supplied).  Accord Commonwealth v. Grinkley, 44 Mass. App. Ct.
62, 72 (1997) ("The fact that as police officers approached the
group started walking quickly away did not elevate the police
officers' inchoate suspicion to the level of reasonableness
justifying a stop and frisk, even though a firearm was
reportedly involved").  Contrast Commonwealth v. Mercado, 422
Mass. at 371 ("[T]he information in [the police officer's]
possession allowed him to distinguish [the defendant] and his
companion from other persons in the vicinity.  The radio report
narrowed the range of possible suspects to males of Hispanic
descent who were in the vicinity south of 146 Main Street.  [The
witness's] statement further narrowed the range of suspects to
males of Hispanic descent then present in the Kangaroo Crossing
store.  That information, coupled with the behavior of [the
defendant] and his companion on seeing a police officer as they
left the store, was sufficient for [the police officer] to form
a reasonable suspicion of those two particular men");
Commonwealth v. Sykes, 449 Mass. 308, 309-310, 314-315 (2007)
(After responding to a report of Hispanic and black males
engaged in illegal drug activity, police observed defendant look
at them and then pedal away from the area on a bicycle; police
pulled alongside the defendant in their unmarked vehicle and

asked him if he would speak with him; police observed the defendant speed up, hit a tree, abandon the bicycle, and then flee on foot while clenching his waistband; describing the case as close, the court reasoned that the defendant's flight combined with clenching his waist was enough to establish a reasonable suspicion that a crime was taking place); Commonwealth v. Montiero, 71 Mass. App. Ct. 477, 478-480 (2008) (Reasonable suspicion found when, as police conversed with several individuals known for gun-related incidents, officers observed one of the men give a hand signal to the defendant who was nearby on a bicycle and who then pedaled away; officers drove alongside the defendant in their unmarked vehicle as he rode his bicycle and asked if they could speak with him; defendant then dropped his bicycle and started to run).

In Commonwealth v. Battle, 365 Mass. 472, 475 (1974), the Supreme Judicial Court also explained the limited significance of evasive behavior in the absence of other specific evidence of criminal activity:

"On seeing two persons run into an apartment building in apparent response to an approaching police vehicle, the police had the right -- if not the duty -- to conduct further visual investigation while the two persons remained in public view. Such police conduct is not a search or seizure, however expansively one wishes to interpret those terms, and therefore a lack of probable cause to arrest or even ground to conduct a 'stop and frisk' is irrelevant. The requirements of the Fourth Amendment to the Constitution of the United States enter into the picture at a later point in this case, when the arrest was actually made." (Footnote omitted.)

This case is also distinguishable from Commonwealth v. Marrero, 33 Mass. App. Ct. 440, 444-445 (1992), where we held that the defendant's flight when approached near the site of a recent breaking and entering was a factor that, along with other factors, justified the decision by police officers to detain the defendant for a threshold inquiry. See Commonwealth v. Sweezey, 50 Mass. App. Ct. 48, 52 (2000) (defendant's flight after valid stop by officers elevated officers' reasonable suspicion of criminal activity).

probative of whether a crime was, is, or is about to be committed.[5]  A valid investigatory stop or threshold inquiry requires the Commonwealth to prove "that the police had reasonable suspicion, before initiating the stop, that 'a person has committed, is committing or about to commit a crime.'" Commonwealth v. Walker, 443 Mass. 867, 872 (2005) (emphasis supplied), quoting from Commonwealth v. Comita, 441 Mass. 86, 91 (2004).[6]  In this case, Officer Anjos acted on a hunch that the

---

[5] The rule in Mercado, supra, that flight to avoid the police, standing alone, is not sufficient to constitute reasonable suspicion, is not inconsistent with the holding in Commonwealth v. Sanchez, 403 Mass. 640 (1988).  There, the court observed that "flight from police, after an initial consent to a search and before any pursuit by the police, provides a reasonable and articulable suspicion justifying an investigatory stop."  Id. at 645.  Similarly, in Commonwealth v. Williams, 422 Mass. 111 (1996), the circumstances involved more than mere flight at the approach of the police:

> "The defendant was running down a busy street at sprint pace in broad daylight. . . .  The defendant was sweating, had a strained expression on his face, and discarded his shirt without breaking pace.  The police, without solicitation, received a beeper dropped by the defendant (or his unnamed joint venturer).  The defendant then took evasive action by running through back yards and scaling chain link fences.  It was appropriate for the police to pursue the defendant in order to effectuate a threshold inquiry."  Id. at 117.

[6] See Commonwealth v. Wren, supra; Commonwealth v. Willis, 415 Mass. 814, 817 (1993); Commonwealth v. Hernandez, 448 Mass. 711, 714 (2007).  As the United States Court of Appeals for the First Circuit has observed:  "Warrantless investigatory stops are allowable if, and to the extent that, police officers have a reasonable suspicion of wrongdoing -- a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular

two black males he encountered about one mile away from the crime scene and about thirty minutes after the commission of the offense, were somehow connected to that crime.  To this day, that remains unestablished as the defendant is not charged with the breaking and entering that precipitated these events.  For these reasons, I respectfully dissent.

A.  Geography.  In order to understand why the initial encounter between Officer Anjos and the two black males did not contribute in any objective sense to reasonable suspicion that they were involved in the burglary on Hutchings Street, a consideration of the local geography is instructive.  Two maps of the neighborhood in question were downloaded from Google Maps[7] and were received in evidence at the suppression hearing.  Using the same source,[8] I considered first, a broader, less magnified view, and second, an abridged and enlarged view pinpointing the points of interest in this series of events.  See Appendix A and B.[9]  The following observations are significant.  First, only the

---

crime."  United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003), citing Terry v. Ohio, 392 U.S. at 21.

[7] Http://maps.google.com.

[8] Http://maps.google.com.

[9] I take judicial notice of the accuracy of the layout of the streets and the measurement of the distances between landmarks in Roxbury, as depicted on both of the maps in the Appendix.  See United States v. Perea-Rey, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012); Pahls v. Thomas, 718 F.3d 1210, 1216 n.1

victim or his foster mother could have supplied the police with firsthand knowledge about the path of flight of the three perpetrators. Looking out to the street from the victim's bedroom window, one's ability to see where the perpetrators may have gone is very limited. According to the evidence, it was a backyard window and allowed one to see only twelve to fifteen yards, up to the corner where Hutchings and Harold Streets intersect. Officer Anjos testified on redirect that the victim "observed them running towards Harold Street and he wasn't sure whether they went down Walnut or Seaver, but he believed it was either one of those streets." The prosecutor then asked, "So he [the victim] saw them run down Harold Street, but he was guessing as to where they might have gone from there?" To which Anjos responded, "Yes, he was." These alleged directions of flight, beyond Harold Street, were based on the victim's guess and not on his observation.

Second, there was testimony by Officer Anjos that approximately twenty-five minutes elapsed from the time of the

---

(10th Cir. 2013). See also United States v. Brown, 636 F. Supp. 2d 1116, 1124 n.1 (D. Nev. 2009) ("Courts have generally taken judicial notice of facts gleaned from internet mapping tools such as Google Maps or Mapquest"). Although judicial notice ordinarily occurs only after the parties are given an opportunity to be heard, see Mass. G. Evid. § 201(d) (2014), I do not believe that step is required in this instance. The maps in the Appendix are taken from the same source as the exhibits admitted in evidence at the hearing, and depict the same geographical area, albeit at different scales.

initial 911 telephone call to when he first encountered the two black males about one mile from the scene of the crime. The perpetrators could have fled in any one of several directions. Assuming they were traveling on foot, they could have traveled to any location within a circle with a radius of approximately two miles in which the center point is the intersection of Hutchings Street and Harold Street. This area is so large that it extends beyond the boundaries of Roxbury and into the Dorchester and Jamaica Plain sections of Boston. See Appendix A. See also post at         n.1 (Rubin, J., dissenting).

Third, Officer Anjos testified at the suppression hearing that the victim reported that the perpetrators were seen "running down Hutchings towards Harold Street in the direction of Seaver or Walnut Avenue." The judge found that the victim "stated he saw them run down Hutchings Street towards Seaver Street. One black male ran towards Walnut" Avenue. The majority states that the victim reported the "men ran down Hutchings Street -- which could have led them either to Seaver Street or to Walnut Avenue." Ante at         . While, as noted supra, the view from the victim's bedroom was limited, a person running down Hutchings Street could navigate his way to Walnut Avenue or to Seaver Street. However, Walnut Avenue, like Seaver Street, winds its way through Roxbury, crossing many other streets, and is more than one mile in length, running both to

the north and to the south of the crime scene.  See Appendix B. Furthermore, as Officer Anjos candidly observed on cross-examination, Seaver Street from Hutchings Street is in the opposite direction of the Dale Street area where the arrest occurred.  Thus, knowledge that one, two, or three black males wearing dark clothing who were involved in a breaking and entering at a home near the intersection of Hutchings Street and Harold Street, fled toward Seaver Street or Walnut Avenue, even if the information is presumed reliable, is not, absent a description of their height, weight, age, facial features, distinctive clothing, or other distinguishing characteristics,[10] probative of whether two black males wearing dark clothing encountered about thirty minutes later near the intersection of Walnut Avenue and Martin Luther King Boulevard, were connected to the breaking and entering.

Fourth, the majority also relies on the fact that Officer Anjos testified that when he left the crime scene he "began to drive around the area" and saw no one else on the street until he was driving back to the police station and encountered the two males in question.  Ante at      .  Anjos explained at the hearing that he traveled "up and down Harold Street, Walnut

---

[10] Officer Anjos testified that there was nothing unusual about the color or the style of the hooded sweatshirts the two males were wearing, and that in his experience he had encountered many individuals in that neighborhood wearing hooded sweatshirts.

Avenue, Holworthy, onto MLK Boulevard."  These streets are shown on the maps in the Appendix.  They are only a small subset of the area in the circle with a two-mile radius, within which the perpetrators may have fled.  The majority attaches significance to the fact that Officer Anjos testified that he did not see anyone out on the streets.  Ante at      .  However, on cross-examination, he admitted that during the course of radio communications regarding this incident, Sergeant Christopher Bailey broadcast a report "that he saw one kid with a backpack on Seaver between Blue Hill Avenue and Elm Hill Avenue."

B.  Particularized suspicion.  "To make an investigatory stop based solely on a physical description, the description need not be so particularized as to fit only a single person, but it cannot be so general that it would include a large number of people in the area where the stop occurs."  Commonwealth v. Depina, 456 Mass. 238, 245-246 (2010).  See Commonwealth v. Grinkley, 44 Mass. App. Ct. 62, 67 (1997) ("Unparticularized racial descriptions, devoid of distinctive or individualized physical details -- even were they of a certain person . . . -- cannot by themselves provide police with adequate justification for stopping an individual member of the identified race who happens to be in the general area described by the informant").  For example, in Commonwealth v. Cheek, 413 Mass. 492, 496 (1992), the Supreme Judicial Court observed that:

> "[T]he description of the suspect as a 'black male with a black ¾ length goose' could have fit a large number of men who reside in the Grove Hall section of Roxbury, a predominantly black neighborhood of the city. The officers possessed no additional physical description of the suspect that would have distinguished the defendant from any other black male in the area such as the suspect's height and weight, whether he had facial hair, unique markings on his face or clothes, or other identifying characteristics. That the jacket matched was not enough to single him out. Moreover, the Commonwealth presented no evidence to establish that a '¾ length goose' jacket, the sole distinctive physical characteristic of the garment, was somehow unusual or, at least, uncommon as an outer garment worn on a cold fall night."

In the present case, when Officer Anjos first encountered the defendant and his companion, Officer Anjos had even less evidence linking them to the reported crime than the police officer in Cheek.

In numerous decisions, both before and after Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Judicial Court has explained that individualized suspicion is the ingredient that differentiates reasonable suspicion from arbitrary police action. In Alegata v. Commonwealth, 353 Mass. 287, 293 (1967), the court declared unconstitutional that portion of G. L. c. 41, § 98, that authorized the criminal prosecution of persons found on the street during the nighttime in circumstances in which the arresting officer suspected the person of "unlawful design," id. at 290, and was not satisfied with the person's explanation for being abroad in the nighttime, ibid. Although the court reasoned that the statute was unconstitutionally vague because

it did not give an ordinary person adequate notice of what conduct was proscribed, the court made the following observation, which is of special significance in this case: "The problem with suspicion is that it is a subjective term incapable of providing any intelligible standard to guide either suspect or court. The absence of limiting standards leaves the citizen at the 'mercy of the officers' whim or caprice.'" Id. at 292-293, quoting from Brinegar v. United States, 338 U.S. 160, 176 (1949). See Commonwealth v. Lawton, 348 Mass. 129, 133 (1964);[11] Commonwealth v. Ballou, 350 Mass. 751, 755 (1966);[12]

---

[11] In Lawton, supra, the Supreme Judicial Court made this observation:

"We are of opinion that the combination of facts known to [the officer] reasonably permitted such a conclusion. He had learned of a recent break from his superiors and at once went to the house. He was told that a female occupant had seen a man in a heavy dark coat run out of the back door and onto and across the adjacent golf links toward Fuller Street. Soon after, while searching in the vicinity of the Fuller Street entrance to the golf course, he had come upon the defendant attired in a heavy dark coat. He could reasonably conclude that not many men would be abroad that night in that vicinity attired in an article of clothing so unsuited to a temperature of eighty-five to ninety degrees. He followed the elementary and highly reasonable course of attempting to interrogate the defendant by way of a brief threshold inquiry. . . . He was rebuffed by obscene replies and outright refusals to answer."

[12] Consider this observation by the Supreme Judicial Court in Ballou, supra:

"We make no conclusion that there was probable cause to arrest before obtaining proof of secret possession of the

Commonwealth v. Dottin, 353 Mass. 439, 441-442 (1968);[13]

Commonwealth v. Wilson, 52 Mass. App. Ct. 411, 413-414 (2001).[14]

---

revolver. The point we decide is that the two officers acted reasonably in the steps taken to avoid being shot down and to prevent a sudden breach in the community's defences against crime. We do not depend upon judicial notice of a gang war. The evidence admitted amply showed that [a police captain] knew of such a war. He further knew that he was looking for one who had achieved prominence in discussions in his own station house; who had gained notoriety in the State Police Journal and in State police circulars in connection with the recent wave of gangland killings; and who was an associate of [a police detective], a supposed participant in that war. He [the police captain] realized that both men had reputations for carrying guns, and was aware of the defendant's conviction and sentence for gun carrying. Reference to the conviction viewed in perspective with the captain's other information -- in itself quite adequate to put an intelligent police officer on his guard -- is not a classification of the defendant as an inferior grade of citizen, but it is the contribution of an additional fact of importance entering into the formation of a common sense judgment."

[13] In Dottin, supra, the Supreme Judicial Court made this observation:

"Upon the information the police officer had and what he observed there was ample basis for his stopping the cab. His official information acquired from his superiors at frequent roll call formations was that the Roxbury District was plagued by housebreaks and that the practice was to carry away the loot in cabs. This was not something for him to reject as hearsay. He saw the television set on the front seat, and one of the three men in back was well known to him as a housebreaker. Stopping the cab was the only proper course for him to take in discharge of his duty to protect the area to which he was assigned. . . . After the cab was stopped, the reasonable course was to identify the men whose general attitude was uncooperative. They united in an incredible reply as to ownership of the television set. It was reasonable to order them out of the cab. Since they were placing their hands in their pockets, the

Likewise, in Commonwealth v. Anderson, 366 Mass. 394, 399-400

(1974), a threshold inquiry was justified as a result of an

anonymous report of a man on a bus who was armed and in

possession of narcotics because the tip was highly specific and

the police were able to corroborate much of it before they

acted.[15]

---

officer did not have to await the production of a gun to
ascertain whether they were armed."

[14] In Wilson, supra, we explained that the police were
justified in detaining the passenger in a vehicle that was
validly stopped for a traffic violation because:

"[t]he following facts were known by the police officers:
(1) they were in a high crime area (2) at 3:30 A.M.; (3) a
speeding car which they had stopped halted in the middle of
the intersection and the driver and passenger side doors
both opened; (4) the defendant, a passenger, 'suddenly
bolted from the car, [5] while holding his chest as if
concealing something, . . . [6] while looking around
furtively.'"

[15] In Anderson, supra at 395-396, the court described the
facts as follows:

"The sole witness for the Commonwealth was Officer William
H. Kennefick, Jr., of the Boston tactical patrol force.  On
August 24, 1972, while in uniform, he was on duty on a paid
detail at the Greyhound bus terminal in Boston, and about
12:20 A.M., having been summoned to the dispatcher's booth,
was handed a page from a newspaper called the 'Good News of
Jesus,' published in New Jersey.  Written on the newspaper
was the message, 'New York to Boston.  Please get the
Boston Police.  Bus terminal Boston Greyhound.  1 Man Armed
& Dangerous.  Black.  Blue hat.  Brown Paper Bag.
Important!  has Narcotics.  This is No Joke.'  The message
was unsigned.  The officer was told by the dispatcher that
a bus driver had just handed it to him, the bus driver
stating that he had been given the paper as he went through
a toll booth on the road from New York to Boston.  The toll

C. <u>Flight</u>.  "An attempt to avoid contact with or observation by the police, while not enough in itself to justify a suspicion, may be considered along with other facts." <u>Commonwealth</u> v. <u>Wren</u>, 391 Mass. 705, 708 n.2 (1984).  See <u>Commonwealth</u> v. <u>Depina</u>, 456 Mass. at 246-247, and cases cited. Given the coincidence of finding two black males who were

---

booth operator had told the bus driver that the newspaper had been thrown into the toll booth shortly before by someone in a New York to Boston bus.  The bus driver also told the dispatcher that he had passed the other New York to Boston bus and arrived at the terminal a brief period ahead of it.  Soon after the dispatcher conveyed this information to Officer Kennefick a New York to Boston bus arrived at the terminal, and the first man to alight from the bus was the defendant, who was black, wore a blue hat, a T-shirt and dungarees, and carried a brown paper bag somewhat larger than an ordinary lunch bag.  The officer indicated to two other uniformed police officers who had entered the terminal that he had a suspect and that they should cut off the street exit of the terminal.  The defendant noticed Kennefick and walked briskly toward the interior of the terminal, looking back on certain occasions at Kennefick who was behind him at a distance of four to five feet.  The defendant progressed approximately fifty to seventy-five feet across the terminal lobby to the exit door, at which point the other two officers entered through the doors.  The defendant hesitated and then made a 'gesture' as if attempting to get rid of the bag in his hand.  Officer Kennefick grabbed his wrist and shoved him against the wall, whereupon the bag fell to the floor.  The other two officers also reached the defendant and began a pat-down.  While the pat-down was proceeding, Kennefick, keeping his eyes on the defendant and holding his hand, groped for the bag which he accidentally picked up by the wrong end, with the result that the contents spilled on the floor.  The contents consisted of three balls partially covered in aluminum foil and partially in cellophane. Through the cellophane Officer Kennefick could see numerous small envelopes containing white powder."

dressed in dark clothing, one of whom was wearing a black hooded sweatshirt, on a Roxbury street at 9:30 P.M. on a winter evening, the additional consideration that they jogged away when Officer Anjos attempted to speak with them and, moments later, ran away at the approach of Officers Carr and Santosuosso,[16] is insufficient to establish reasonable suspicion to support a stop. In the absence of other factors indicating that a person has, is, or is about to commit a crime, flight from the police adds no weight to the calculation of reasonable suspicion. This is the majority view in our nation. "That some city residents may not feel entirely comfortable in the presence of some, if not all, police is regrettable but true." State v. Tucker, 136 N.J. 158, 169 (1994) (unless flight from police is accompanied by other evidence of involvement in criminal activity, it does not justify detention). "Fear or dislike of authority, distaste

---

[16] For purposes of this analysis, I assume that the defendant was not seized until the second officer told him to stop as the defendant was running up the hill. See Commonwealth v. Rock, 429 Mass. 609, 611 (1999) (no seizure where officers in unmarked cruiser followed defendants for 150 feet without lights or siren, "until defendants voluntarily stopped running. One officer left the cruiser, identified himself, and said, 'Guys, can I talk to you for a second?' One officer stepped between the two defendants"). Contrast Commonwealth v. Barros, 435 Mass. 171, 176 (2001) (seizure where officer said, "Hey you. I wanna talk to you. Come here"). See also Commonwealth v. Thinh Van Cao, 419 Mass. 383, 387-388 (1995) (defendant not seized when uniformed detective approached group in parking lot and asked them for their identities without ordering them to answer or indicating that they could not terminate encounter).

for police officers based upon past experience, exaggerated fears of police brutality or harassment, and fear of unjust arrest are all legitimate motivations for avoiding the police." State v. Hicks, 241 Neb. 357, 363 (1992).[17]

In addition to an understanding of the local geography and particularized suspicion, "a page of history" about encounters between young black men and the police in Roxbury "is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921) (Holmes, J.). For example, in Commonwealth v. Phillips, 413 Mass. 50, 56-57 (1992), the Supreme Judicial Court noted that there was a basis for the judge's finding that the

---

[17] See Illinois v. Wardlow, 528 U.S. 119, 132 (2000) ("Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence") (Stevens, J., concurring in part and dissenting in part); Liberal v. Estrada, 632 F.3d 1064 1078 (9th Cir. 2011) ("[A]voidance of the police, standing alone, does not give rise to a particularized, reasonable suspicion," as here, where defendant's conduct was "making several turns and then parking next to a dumpster in a darkened alley"); People v. Rahming, 795 P.2d 1338, 1342 (Colo. 1990) ("An individual's attempt to avoid coming in contact with a police officer does not, without more, justify an investigative detention of the individual"); People v. Shabaz, 424 Mich. 42, 62 (1985) ("Defendant's flight at the approach of police did not, by itself, in the circumstances of this case, support a reasonable suspicion. Although it is uncontroverted that flight may be a factor to be considered in ascertaining whether there is reasonable suspicion to warrant a Terry stop, . . . flight alone is not a reliable indicator of guilt without other circumstances to make its import less ambiguous").

Boston police department pursued a policy calling for "searches on sight" of black youths in Roxbury:

> "The evidence that the Commonwealth characterizes as irrelevant is the evidence concerning a Boston police department policy to 'search on sight' all young, black persons in Roxbury suspected of being gang members or of being in the company of a gang member.  The Commonwealth also characterizes as irrelevant evidence of other allegedly illegal searches by either the officers who seized the firearm and ammunition in this case or other officers.  We do not agree that the challenged evidence was irrelevant.

> "It is undoubtedly true that, had there been no evidence of an official police policy of 'searches on sight,' evidence that the officers directly involved in this case or other officers on various occasions conducted unconstitutional searches would not have been relevant.  Standing alone, evidence of those isolated events would not have increased the likelihood that the challenged search was unlawful. . . .  However, the evidence of specific instances of constitutionally unreasonable 'on sight searches' tends to support the further evidence of an official policy approving such procedures and, in our view, the evidence of that official policy was relevant.  That policy evidence tended to support the eyewitness testimony relied on by the judge to conclude that the search in this case was an 'on sight search.'"

Although there is no evidence in this case that a "search on sight" policy continues to exist, the debate continues regarding whether certain street encounters between members of the Boston police department and civilians are influenced by race and not simply by the existence of reasonable suspicion or probable cause.[18]

---

[18] Consider Officer Anjos's candid admission at the suppression hearing.  When asked about his intentions in approaching these two black males, he testified, "I was going

[to] figure out who they were and where they were coming from and possibly do" a field interrogation observation (FIO).

In October, 2014, the Boston police commissioner released the results of a study commissioned by the Boston police department (BPD) that examined all FIO reports (approximately 250,000 FIOs) done by Boston police officers from 2007 to 2010. In announcing the results, the commissioner released a statement that reads in part as follows:

> "Preliminary findings show the Department is targeting gang members in high crime areas.  The study showed that the amount of crime in a neighborhood is the most powerful predictor of the number of FIO's done in a neighborhood. The study showed that officers are repeatedly stopping or observing individuals with criminal records and/or gang membership (5% of the individuals FIO'ed account for more than 40% of the total FIO's).  Gang Membership and prior arrest history are very strong predictors of repeated FIO's.  The study did show some racial disparities that must be addressed.  Specifically, the study showed that during the given time period, minority neighborhoods do experience higher levels of FIO activity, approximately 1% of FIO's completed per month, when controlling for crime. It also showed that Black subjects are 8% more likely to be stopped repeatedly and 12% more likely to be frisked and searched when controlling for other factors like Criminal History and Gang Membership in Violent Crime areas.  While there is still some work be to done to ensure we are closing the gap on these racial disparities, the numbers of overall FIO activity are encouraging, and indicates the Department is headed in the right direction.  BPD has decreased the number of FIOs it completes by almost 42% since 2008 and has decreased arrests by 33%, with steady reductions in overall crime.  These numbers demonstrate that officers are utilizing targeted enforcement to reduce crime."

Boston Police Commissioner Announces Field Interrogation and Observation (FIO) Study Results, available at http://bpdnews.com/news/2014/10/8/boston-police-commissioner-announces-field-interrogation-and-observation-fio-study-results [http://perma.cc/H9RJ-RHNB] (last visited March 26, 2015).

In a statement released contemporaneously with the release of the BPD study, the American Civil Liberties Union (ACLU) and the ACLU of Massachusetts took a different view.

"Key preliminary findings, all of which control for non-race factors, include the following:  Young black men were more likely than young white men to be targeted for police-civilian encounters such as stops, frisks, searches, observations, and interrogations.  When police-civilian encounters occurred, young black men were more likely than young white men to be frisked or searched.  Young black men were more likely to be targeted for repeat police-civilian encounters."

Boston Police Data Shows Widespread Racial Bias in Street Encounters with Civilians, available at https://www.aclu.org/criminal-law-reform-racial-justice/boston-police-data-shows-widespread-racial-bias-street-encounters [http://perma.cc/9ABJ-VT5C] (last visited March 26, 2015).
In October of 2014, the ACLU issued its own report based on the research conducted for the BPD entitled "Black, Brown and Targeted," available at https://www.aclum.org/sites/all/files/images/education/stopandfrisk/black_brown_and_targeted_online.pdf [http://perma.cc/J4P3-ZRYP] (last visited April 9, 2015).  In addition, according to the report summary:

"63% of Boston police-civilian encounters from 2007-2010 targeted Blacks, even though Blacks made up less than 25% of the city's population.  Even after controlling for crime, Boston police officers were more likely to initiate police encounters in Black neighborhoods and to initiate encounters with Black people.  Boston police gave essentially no justification for 75% of these encounters, simply listing 'investigate person' as the reason.  More than 200,000 encounters led to no arrest, and only 2.5% led to seizure of contraband."

Stop and Frisk Report Summary, available at https://www.aclum.org/sites/all/files/images/education/stopandfrisk/stop_and_frisk_summary.pdf [http://perma.cc/7APK-8MG9] (last visited March 26, 2015).
These reports, the data contained within them, and the statements referred to, supra, about them, are not cited as adjudicative facts outside the record about what happened in this case or why the events occurred as they did.  Rather, I consider this information solely to place the issues in historical context in order to illuminate what I regard as the policies underlying our precedents defining the objective test that the police must satisfy to conduct a valid stop for

D. <u>Reasonable suspicion summary</u>. In the present case, when Officer Anjos first encountered the defendant and another person near the intersection of Walnut Avenue and Martin Luther King Boulevard, Officer Anjos was not nearby the crime scene as the majority asserts. <u>Ante</u> at        . Moreover, the only similarity between the two males Officer Anjos encountered and the description of the perpetrators of the breaking and entering was their race and the fact that they wore dark clothing and one man wore a hooded sweatshirt. There was nothing unusual or out of place about their clothing. The two males were walking, not running. The two males were not carrying anything that might suggest a connection to the crime, nor otherwise acting in a suspicious manner. Officer Anjos made no other observation that would indicate that the two males were engaged in criminal activity. The two males did not flee upon seeing the marked cruiser, but jogged away only when Officer Anjos asked them to wait. When, moments later, the males encountered the other two officers, the defendant began to run. These circumstances, while sufficient to raise suspicion, do not establish the degree of individualized suspicion that a crime has occurred, is occurring, or is about to occur to justify a detention for a threshold inquiry.

---

purposes of a threshold inquiry. See Advisory Committee's Note to Fed.R.Evid. 201.

The majority seeks to buttress its view that Officer Anjos acted on the basis of reasonable suspicion by reference to the inventory of relevant factors we identified in Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 554-556 (2002). Ante at          . I agree that Doocey is instructive, but in my view it points to the opposite result. Officer Anjos lacked a particularized description of the perpetrators, he canvassed only a portion of the area within which the perpetrators could have fled before he fixed his sights on the defendant and his companion, Officer Anjos did not encounter the males near the scene of the crime, he did not encounter them immediately after the commission of the crime, the suspects were not the only black males seen by the police on the streets at the time, and the character of the park into which the males fled does not contribute to the likelihood that they were involved in a recent breaking and entering.

Because the defendant and his companion were not targeted for investigation due to their presence in a high crime area, the only Doocey factor that Officer Anjos could rely on was the defendant's flight. It is settled that a person is under no obligation to cooperate with the police when asked to stop and to submit to a threshold inquiry. Officer Anjos had every right to harbor a subjective belief that the two men he encountered were involved in the breaking and entering on Hutchings Street.

Good police work often begins with a hunch.  However, a hunch that criminal activity is underway because individuals choose to run away instead of declining, politely, an invitation to stop and to converse does not justify a seizure.  The fact that the actions taken by the police in this case resulted in the seizure of a loaded firearm is of no consequence because "[a] search prosecuted in violation of the Constitution is not made lawful by what it brings to light; the doctrine has never been recognized by this Court, nor can it be tolerated under our constitutional system."  Commonwealth v. Holley, 52 Mass. App. Ct. 659, 665-666 (2001), quoting from Byars v. United States, 273 U.S. 28, 29 (1927).

For the within reasons, I respectfully dissent.

RUBIN, J. (dissenting). I join Justice Agnes's dissenting opinion. Three African-American men were involved in the commission of a burglary, one dressed in red, two in black, at least one of those wearing a hooded sweatshirt (hoodie). They stole a backpack, a laptop computer, and five custom baseball hats. There were conflicting reports about the direction in which they ran.

Under art. 14 of the Massachusetts Declaration of Rights, the police were not entitled on this basis thirty minutes later to stop any pair of African-American men in dark clothes walking within a twelve-square-mile area[1] so long as at least one of them was wearing a hoodie -- a widely worn fashion particularly among young people of color, see, e.g., Staples, Young, Black, Male and Stalked by Bias, New York Times, April 14, 2012;[2] Chasmar, Smithsonian Director Wants Trayvon Martin's Hoodie, Washington Times, July 31, 2013.[3] And, as Justice Agnes describes, at least

---

[1] As Justice Agnes explains, even if the individuals were walking, they could have gone two miles in that time, in any direction. Ante at        (Agnes, J., dissenting). The area of the circle described by this two-mile radius (area = π x radius$^2$) is approximately 12.57 square miles.

[2] Staples, Young, Black, Male, And Stalked by Bias, N.Y. Times, April 15, 2012, at SR10.

[3] Chasmar, Smithsonian Director Wants Trayvon Martin's Hoodie, Washington Times, July 31, 2013, at http://www.washingtontimes.com/news/2013/jul/31/smithsonian-director-wants-trayvon-martins-hoodie/ [http://perma.cc/F35B-VPL9] (last visited April 2, 2015).

given the settled law that we are required to apply, this result does not change even if the individuals flee when approached by police.  Ante at    .  See Commonwealth v. Mercado, 422 Mass. 367, 371 (1996).

What ultimately divides the panel is the significance of this latter-described evasive action.  I write separately because I do not think we need to address its significance in this case, and were it not for a majority of the court reaching the question, I would not do so.  Although the majority holds, ante at    , and Justice Agnes's dissent assumes, ante at    , that the defendant and his companion were stopped only after they ran from the police, they were, as a matter of law, stopped before that, while they were simply walking down the street.  Boston police Officer Luis Anjos, after seeing them walking on the sidewalk yelled out, "Hey guys, wait a minute."  This was a "command to stop," not a request, and it marks the point at which the defendant was seized for purposes of the Massachusetts Declaration of Rights.  Commonwealth v. Nestor N., 67 Mass. App. Ct. 225, 228 (2006) (Duffly, J.).  Cf. Commonwealth v. Martin, 467 Mass. 291, 301, 303 (2014) (where officer testified that he said, "Hold on a second, I want to talk to you," and judge "found that [he] had 'called out to [the defendant] to hold up or stop we want to speak with you or words to that effect," the officer's words more closely resemble a

'request to speak with the defendant and ask questions' . . . than a 'command to stop'"). This seizure came before the individuals had engaged in their only suspicious conduct described in this case, i.e., jogging and then running from the police.

At the time of the stop, the police knew there were two individuals walking on the street, not three. They did not appear to have any of the proceeds of the burglary on their persons. They were stopped in a densely populated urban area thirty minutes after the burglary and about one mile away from the scene. Indeed, at the hearing on the motion to suppress, the arresting officer disclaimed having concluded that these individuals were suspects in the burglary -- he would state only that Officer Anjos had reached that conclusion. Although of course reasonable suspicion must be measured on facts and circumstances known to police officers prior to the seizure, in this case it can come as no surprise that these two individuals never have been linked in any way to the burglary of which Officer Anjos testified he suspected them.

As I said at the outset, and as appears undisputed here, it is impermissible for the police to stop any two black men walking on the street wearing hoodies simply because thirty minutes earlier and one mile away two black men in dark clothing, at least one of whom was wearing a hoodie, were among

three men involved in a burglary.  Action of this type clearly violates the protection our Massachusetts Declaration of Rights provides to all persons in the Commonwealth.  It is also corrosive of the relationship between law enforcement and the members of communities they are sworn to protect.  Yet that describes what happened here.  I respectfully dissent.



## Appendix B.

